[No. B159815. Second Dist., Div. Four. Apr. 7, 2004.]

DAVID L. DICKENS, Plaintiff and Appellant, v.
PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, et al.,
Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts B. and C. in Discussion.

COUNSEL

Ronald Richards and E. Christine Hehir for Plaintiff and Appellant.

Galton & Helm, Stephen H. Galton, Catherine V. Perry and Ann C. Schneider for Defendants and Respondents.

OPINION

HASTINGS, J.—

## INTRODUCTION

This appeal challenges the trial court's grant of an anti-SLAPP motion[1] directed at a cause of action for malicious prosecution in a three-count lawsuit.

The case arises out of the following facts. In 1987, Provident Life and Accident Insurance Company (Provident) issued a disability insurance policy to David L. Dickens (Dickens). In 1992, Dickens presented a claim for total disability. Provident paid on the claim until June 1997 when, based upon its investigation, it concluded the claim was fraudulent. Two years later, the federal government indicted Dickens for insurance fraud. A jury ultimately acquitted Dickens of all charges. Dickens thereafter sued, inter alia, Provident and Donald Pooler (Pooler), one of Provident's investigators. Relying upon his acquittal, Dickens alleged a cause of action for malicious prosecution, claiming Provident and Pooler acted without probable cause and with malice because they had presented false information to the federal authorities and used their influence to initiate an improper prosecution. Provident and Pooler thereafter successfully brought an anti-SLAPP motion to strike that cause of action from the complaint.

 This appeal by Dickens follows. In the published portion of this opinion, we conclude that a malicious prosecution claim based upon the prior termination of a criminal prosecution in the plaintiff's favor falls within the ambit of the anti-SLAPP statute. In the nonpublished portion of this opinion, we conclude Dickens's opposition papers to the anti-SLAPP motion failed to establish a prima facie case of liability for malicious prosecution because he

---

[1] SLAPP is an acronym for "strategic lawsuits against public participation." (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 813 [33 Cal.Rptr.2d 446].) An anti-SLAPP motion, codified in Code of Civil Procedure section 425.16, provides a procedural remedy to gain an early dismissal of a lawsuit or cause of action that qualifies as a SLAPP. (All subsequent undesignated statutory references are to the Code of Civil Procedure unless stated otherwise.)

offered no evidence that either Provident or Pooler was instrumental in initiating the federal prosecution. In addition, we reject Dickens's claim that the trial court abused its discretion in denying his oral request, made for the first time at the hearing on the anti-SLAPP motion, to continue the motion so he could conduct further discovery. We therefore affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

*Disability Insurance*

In 1987, Provident issued a disability insurance policy to Dickens. In 1992, Dickens presented a claim on the policy. Provident paid $7,030 per month until June 1997 when it concluded the claim was fraudulent.

*The Federal Prosecution*

In February 1999, the federal government indicted Dickens. The indictment alleged Dickens had defrauded Provident because he "falsely claimed that he was disabled from performing his job duties by certain psychological disorders" and thereafter on monthly statements claimed "he had not been to his place of business since his last report to Provident, and was unable to perform any duties of his occupation" when, in fact, he "continued to perform all of his duties of his occupation at his usual place of business with no impairment to his functioning." As a result of these misrepresentations, Dickens obtained $351,500. The indictment alleged 39 counts of mail fraud. Each count represented a monthly disability check that Provident, in reliance upon Dickens's misrepresentations, had mailed to him from March 1994 through May 1997.

Following trial, the jury acquitted Dickens of all charges in August 2000.

*Dickens's Action Against Provident and Pooler*

After his acquittal, Dickens filed the lawsuit underlying this appeal. The operative pleading is the second amended complaint. It alleges causes of action for breach of contract, bad faith denial of benefits, and malicious prosecution against, inter alia, Provident and Pooler.[2] On this appeal, only the

---

[2] The other named defendants were Universal Professional Services, Inc. and its president Les Wechter. The complaint alleged that Universal and Wechter, pursuant to Provident's direction, participated in the investigation of Dickens. In April 2002, Universal and Wechter were dismissed from the action at Dickens's request.

cause of action for malicious prosecution is at issue.[3] In that regard, the complaint alleges the following operative facts.

"Under the direction of Provident," Pooler "knowingly and willingly initiated an unwarranted and biased investigation of [Dickens] in connection with allegations of fraudulently filed monthly claims[.]" Provident and Pooler knew the results of the investigation "would be submitted to federal authorities to prosecute [Dickens]." The investigation "provided no evidence of any criminal wrong doing" by Dickens but Provident and Pooler nonetheless submitted the information to the United States Attorney and used "their connections" in that office to initiate the prosecution. The indictment was "based on the false and incomplete information and testimony provided" by Provident and Pooler. Provident and Pooler "had contact with certain prosecution witnesses to discuss and possibly influenced their testimony prior to their testifying at [his] trial." The prosecution of the case "was personally supervised by a former FBI agent who is now employed at Provident and came to the trial every day and worked hand and foot [*sic*] with the U.S. Attorney."

Provident and Pooler acted without probable cause "in that they did not honestly, reasonably and in good faith believe [Dickens] to be guilty of the crime charged because the information they relied on was hardly more than an interview with [Dickens's] former landlord and a videotape of a single visit to his former workplace. Further, [they] acted without probable cause in that over two years lapsed between the time [Provident] stopped paying [his] benefits in June, 1997, and when [they] submitted the allegations against [him] to have him indicted for fraud." Provident and Pooler acted with malice "in instigating the criminal prosecution in that their motive was to deny [Dickens] of the benefits owed to him on the insurance contract." Provident "used illegal access to the United States Government Attorneys to prosecute [Dickens] criminally to tender his policy as part of a plea agreement."

During the trial, Provident and Pooler "omitted information with respect to certain witnesses and misrepresentations were made to the court with respect to certain prosecution witnesses[.]" In addition, Pooler "made false statements while testifying against [Dickens]."

As a result of this tortious conduct, Dickens suffered economic loss and emotional distress.

---

[3] Several months after ruling upon the anti-SLAPP motion, the trial court granted a defense motion for summary judgment on the remaining two causes of action.

*The Anti-SLAPP Motion*

Shortly after Dickens filed his second amended complaint, Provident and Peeler moved to strike the cause of action for malicious prosecution. They urged: "[Dickens's] claim is based on the reporting of [his] conduct to law enforcement authorities." "There is clearly a public interest in the reporting of criminal activity. . . . allowing this action to continue would have a chilling effect on the willingness of insurers to report criminal conduct." Provident and Pooler therefore urged that unless Dickens could establish a probability that he would prevail upon his cause of action for malicious prosecution claim, it should be stricken from his complaint.

On the issue of whether Dickens could establish a probability he would prevail upon his claim, the evidence established the following sequence of events.

In 1992, Dickens was chairman of the board of Personal Supply Company, a telemarketing sales company. The company was experiencing financial difficulties, primarily caused by an Internal Revenue Service audit and an unrelated theft of a customer list. Consequently, Dickens suffered from depression and anxiety and became unable to work. In September 1992, he sought medical treatment from Dr. Marina Gold. She eventually referred him to Thomas C. Keedy, who holds a Ph.D. in Clinical Psychology. In December 1992, Dickens began psychotherapy with Keedy.

Dickens made a claim for benefits under Provident's disability insurance policy. In support of that claim, Keedy submitted, in March 1993, a seven-page letter to Provident explaining Dickens's condition. Keedy diagnosed Dickens as suffering from posttraumatic stress disorder and major depression and concluded he was "totally disabled from his employment."

In April 1993, Provident agreed, with a reservation of rights and subject to further investigation, to pay Dickens's claim.

Provident had Dr. John Hochman examine Dickens in May 1993. Dr. Hochman concluded Dickens was "partially disabled psychiatrically, but not disabled from performing the substantial and material duties of his occupation in his customary way." In August 1993, Dr. Anna Kagan, a psychiatrist, reached a different conclusion. Her 11-page letter concluded Dickens was "totally temporarily disabled from a psychiatric point of view." (Capitalization omitted.) In a November 1993 letter, Keedy took issue with Dr. Hochman's conclusion and opined that it could take "a year or more" before Dickens would be able to return to work.

Provident continued to issue Dickens monthly payments, subject to its reservation of rights and receipt of reports from Dickens's treating physicians.

Sometime in 1996, Provident commenced, for reasons not explained in this record, an independent investigation of Dickens's claim. Provident assigned the investigation to Pooler. Pooler, in turn, hired Universal Insurance Services, Inc. (Universal) to conduct surveillance of Dickens. A December 6, 1996 memo from Pooler to Linda LaPlume, a Provident claims representative, summarized the results of the investigation. The memo explained that while an August 8, 1996 narrative from Keedy claimed Dickens remained "debilitated and unemployable" because of his major depression and posttraumatic stress disorder, that description appeared to be in direct contrast with the information developed by Universal. Universal had learned that Dickens and another individual had a city business license to do business as American Maintenance and Construction Co. (AMC) and that Dickens was enrolled at American Career College. Universal submitted a surveillance videotape of Dickens driving his car, interacting with his family, and being present at a variety of locations including AMC'S business address and American Career College. Pooler's memo concluded: "I [*sic*] the tape is reviewed, it will be determined that the Insured's [Dickens's] activities, deportment, movements, school and self-employment are not consistent with what he and his doctors are claiming to be a 'disabling condition.' " In addition, Universal submitted a 10-page narrative about its surveillance. Universal's summary states: "While under surveillance, [Dickens] showed no signs of physical disability or hesitation in his movements. While conversing with others, he appeared to speak in a normal manner and he showed no signs of agitation."

Follow-up investigative reports from Pooler generated in January 1997 through March 1997 established that since June 1995, Dickens had been running AMC from the same location he had run his previous business. He spent four to six hours a day at the business (AMC) before going to afternoon classes at American Career College. When confronted by Pooler about his involvement with AMC, Dickens denied any knowledge of or participation in the enterprise. Dickens conceded he was enrolled in an optician's study course at American Career College and admitted he had not told either his doctor or psychologist about those studies. Pooler subsequently interviewed one of Dickens's professors as well as the academic program director at American Career College. According to Pooler, "they indicated [Dickens] is a straight A student and he appears to have no problem concentrating on his work. He gets along with his teachers, classmates and counselors. . . . [Dickens] has never complained about any physical mental or personal problems. . . . He concentrated and performed so well, [his instructor] took him a couple of steps past what the normal student would do[.] [He] has a cheerful personality. He is able to get along with his teachers and classmates in a very pleasant manner."

On May 8, 1997, LaPlume wrote Dickens that payment of further disability benefits was suspended because he had failed to appear at a scheduled independent medical examination. Her letter also stated she had tried to phone him but the number had been disconnected. LaPlume sent a copy of her letter to Pooler, with the notation: "FYI See letter attached. I sent this yesterday certified mail. I also received his claim form yesterday with the same address and no phone number listed so I don't know what's going on but I'm not paying any more benefits until he attends the IME." (Capitalization omitted.)

Pursuant to Provident's request, Dr. Lester Zackler interviewed Dickens on May 12, 1997. Dr. Zackler's 26-page report included a review of the earlier medical reports as well as the investigative reports generated by Pooler. After noting numerous factors that significantly undermined Dickens's credibility about the extent of his depression, Dr. Zackler concluded: "It is my opinion that Mr. Dickens has the capacity to 'perform the substantial and material duties of his occupation.' Current residual psychiatric symptoms are not disabling. His failure to seek work or report current employment is related to motivational issues, not psychiatric disability."

On May 30, 1997, Pooler wrote LaPlume: "I do not recommend issuing additional benefits. I should have my investigation completed by the end of next week. We have developed addi[ti]onal information to close the claim and file insurance fraud charges." A declaration from Pooler prepared in regard to this lawsuit explained: "When my investigation concluded in June 1997, I submitted my findings to the home office. I did not contact any law enforcement authorities with regard to potential criminal activity by [Dickens]. My only other involvement with the criminal prosecution was my testimony in August 2000 [at the federal trial]." A declaration from the vice-president of Universal explained: "When Universals investigative services were completed in June 1997, Universal reported its findings to Provident. No one at Universal contacted any law enforcement authorities with regard to potential criminal activity by [Dickens]. Finally, no employees of Universal testified before the grand jury or at [Dickens's federal] criminal trial[.]"

Provident provided no benefits to Dickens after May 1997.

*The Trial Court's Ruling*

After hearing lengthy argument, the court ruled: "[Dickens] has not demonstrated with admissible evidence the probability of prevailing on the malicious prosecution cause of action, specifically the evidence proffered in the opposition [to the anti-SLAPP motion] is insufficient on the issues of

proving by admissible evidence that the defendant Provident acted with knowledge that they did not have probable cause and also acted with malice, two critical elements of the cause of action for malicious prosecution." The court dismissed the malicious prosecution cause of action against Provident and Pooler. This appeal by Dickens follows. (§§ 425.16, subd. (j) and 904.1, subd. (a)(13).)

## DISCUSSION[4]

### A. THE MALICIOUS PROSECUTION CAUSE OF ACTION IS SUBJECT TO THE ANTI-SLAPP STATUTE

A SLAPP suit is "a meritless suit filed primarily to chill the defendant's exercise of First Amendment rights." (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 815, fn. 2.) Section 425.16, subdivision (b)(1) defines the class of claims subject to an anti-SLAPP motion. These include a cause of action "arising from" an "act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue[.]" Section 425.16, subdivision (e) explains: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law[.]"

In *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728 [3 Cal.Rptr.3d 636, 74 P.3d 737], our Supreme Court held that a malicious prosecution action predicated upon the prior filing of *a civil lawsuit* fell within the ambit of the anti-SLAPP statute. The court reasoned in that context a malicious prosecution "action arises from an underlying lawsuit, or petition to the judicial branch. By definition, a malicious prosecution suit alleges that the defendant committed a tort by filing a lawsuit. [Citation.]" (*Id.* at pp. 734–735.) The court agreed with the Courts of Appeal that had reached a similar conclusion. (*Ibid.*)

---

[4] Provident and Pooler urge that many of the contentions in Dickens's amended opening brief have been waived because they were not presented in his original opening brief. The contention lacks merit. Respondents had moved to dismiss Dickens's appeal based upon the many deficiencies found in his initial opening brief. We denied the motion without prejudice and gave Dickens leave to file an amended opening brief that conformed to the California Rules of Court. He has done so. The contentions are therefore properly before us.

The first issue on this appeal is whether a malicious prosecution cause of action predicated upon the claim the defendants (here, Provident and Pooler) were instrumental in bringing upon a criminal prosecution against the plaintiff (here, Dickens) is subject to an anti-SLAPP motion. We conclude it is.

Our decision in *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 [54 Cal.Rptr.2d 830] is instructive. There, the plaintiff sued for libel and interference with economic relationship. The dispute arose because the defendant intended to file a complaint with the California Attorney General seeking an investigation of whether the plaintiff had honored its contractual obligation to pay the proceeds of an enterprise (celebrity recording) to charity. The factual predicate of the lawsuit was a letter the defendant had sent to various celebrities who had participated in the recording. The letter explained the defendant's intent to lodge a complaint with the Attorney General and sought the recipient's support in doing so. (*Id.* at p. 780.)

The defendant filed an anti-SLAPP motion which the trial court ultimately granted. We held the action fell within the ambit of the anti-SLAPP statute. We reasoned: "[The defendant's] communication raised a question of public interest: whether money designated for charities was being received by those charities. The communication was made in connection with an official proceeding authorized by law, a proposed complaint to the Attorney General seeking an investigation. 'The constitutional right to petition . . . includes the basic act of filing litigation or otherwise seeking administrative action.' [Citation.] Just as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege[,] . . . we hold that such statements are equally entitled to the benefits of section 425.16. [Citation.]" (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman, supra,* 47 Cal.App.4th at p. 784.)

By a parity of reasoning, whatever contact Provident and Pooler allegedly had with the federal authorities was likewise within the ambit of the statute. It was contact with the executive branch of government and its investigators about a potential violation of law. The contact was preparatory to commencing an official proceeding authorized by law: a criminal prosecution for mail fraud. And to the extent Dickens's claim is based upon testimony or evidence offered at his trial, that was also clearly part of an official proceeding authorized by law.

Support for this conclusion can also be found in case law interpreting the litigation privilege as it pertains to reporting criminal activity to law enforcement. In *Wang v. Hartunian* (2003) 111 Cal.App.4th 744 [3 Cal.Rptr.3d 909] [review den., Dec. 10, 2003], the plaintiff sued for, inter alia, false arrest and

malicious prosecution because the defendant had made a citizen's arrest of him. The trial court granted an anti-SLAPP motion and dismissed the case. The Court of Appeal reversed, concluding that "making a citizen's arrest was [not] an act in furtherance of [the defendant's] right of petition or free speech under the state or federal Constitutions." (*Id.* at p. 748.) The court noted that the result might have been different had the tort claim instead been predicated upon the defendant's reporting the plaintiff's criminal conduct to the police (the fact pattern operative in this case). In that instance, because the defendant's conduct would have been privileged under Civil Code section 47, subdivision (b),[5] it would have necessarily been protected activity under section 425.16. The appellate court explained: "In *Williams v. Taylor* (1982) 129 Cal.App.3d 745 [181 Cal.Rptr. 423], the Court of Appeal held that the litigation privilege shields a citizen from liability based on a report to police of potential criminal activity: '[A] communication concerning possible wrongdoing, made to an official government agency such as a local police department, and which communication is designed to prompt action by that entity, is as much a part of an "official proceeding" as a communication made after an official investigation.' [Citations.] Thus, had [the defendant] summoned the police, reported to them [the plaintiff's] conduct with the intention of prompting his arrest, and had the police, after conducting an investigation based upon that report, arrested [the plaintiff], [the defendant's] conduct of making a report to the police might fall within the ambit of section 47, subdivision (b)." (*Id.* at p. 749.) While this language was dicta in that case, its accuracy has since been affirmed by a very recent decision from our state Supreme Court.

In *Hagberg v. California Federal Bank FSB* (2004) 32 Cal.4th 39 [7 Cal.Rptr.3d 803] the Supreme Court resolved a conflict among the Courts of Appeal as to whether section 47, subdivision (b) created an absolute or qualified privilege for filing false police reports. The court cited *Williams v. Taylor, supra,* 129 Cal.App.3d 745 with approval when it held that the privilege was absolute so that knowingly filing a false police report could only create tort liability if a plaintiff could otherwise establish the elements of malicious prosecution.[6] The court explained that the privilege found in section 47, subdivision (b) serves the important public policy of assuring free

---

[5] Civil Code section 47 provides, in pertinent part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any . . . (2) judicial proceeding, (3) in any other official proceeding authorized by law[.]"

All references to section 47 in this discussion are to the above provision.

[6] The privilege is absolute in any tort action except malicious prosecution because " '[t]he policy of encouraging free access to the courts . . . is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.' [Citation.]" (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 216 [266 Cal.Rptr. 638, 786 P.2d 365], quoting from *Albertson v. Raboff* (1956) 46 Cal.2d 375, 382 [295 P.2d 405].)

access to the courts and other official proceedings by insuring freedom of communication between citizens and the public authorities who have the responsibility of investigating wrongdoing. Placing this conclusion in the context of the well-accepted principle that "the tort of malicious prosecution has a potential chilling effect on the willingness of persons to report crimes"[7] (*Ferreira v. Gray, Cary, Ware & Freidenrich* (2001) 87 Cal.App.4th 409, 413 [104 Cal.Rptr.2d 683]), we hold that a malicious prosecution action predicated upon a defendant's alleged participation in procuring a criminal prosecution against a plaintiff falls within the ambit of the anti-SLAPP statute. This conclusion furthers the statute's salutary purpose of acting as "a procedural device for screening out meritless claims" which arise out of constitutionally protected conduct connected to a public issue. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 737.)

Dickens's contrary arguments are not persuasive.

He first urges his malicious prosecution does not fall within the ambit of the anti-SLAPP statute because he "is not attempting to prevent anyone from exercising their free speech rights." This argument misses the mark. As our Supreme Court recently explained: "Section 425.16 nowhere states that, in order to prevail on an anti-SLAPP motion, a defendant must demonstrate that the plaintiff brought the cause of action complained of with the intent of chilling the defendant's exercise of speech or petition rights. There simply is 'nothing in the statute requiring the court to engage in an inquiry as to the plaintiff's subjective motivations before it may determine [whether] the anti-SLAPP statute is applicable.' [Citation.] . . . [¶] . . . 'The legislative concern,' rather, 'is that the cause of action "aris[e] from" an act in furtherance of the constitutional right to petition or free speech.' [Citation.]" (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 58–59 [124 Cal.Rptr.2d 507, 52 P.3d 685].) As explained above, this cause of action does arise from actions allegedly taken by Provident and Pooler in furtherance of their constitutional rights.

Dickens next urges his "lawsuit challenges the totality of [the defendants'] acts—including the denial of [his] claim for benefits, *not* [the defendants'] exercise of free speech or petition rights. . . . [Their] action in reporting that [he] committed insurance fraud was not an act in furtherance of their right of petition or free speech. . . . It was simply their attempt to deny [him] the benefits of his insurance policy in the most decisive way possible." This approach likewise misses the mark. Dickens's cause of action for malicious prosecution challenges not the denial of his claim on the disability insurance policy but instead challenges the actions of Provident and Pooler in allegedly

---

[7] For instance, Insurance Code section 1871 et seq. requires an insurer to report fraud to the public authorities.

playing an instrumental role in procuring the criminal prosecution against him. To the extent Dickens now argues that they took their actions for the improper purpose of unfairly denying him the benefits of his policy, that would simply be circumstantial evidence of malice. And to the extent Dickens's lawsuit actually contests Provident's decision in 1997 to decline to pay any further benefits, that challenge is found in the causes of action for breach of contract and bad faith denial of insurance benefits, causes of action which were *not* subject to the anti-SLAPP motion. (But see fn. 3, *supra.*)

B., C.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order appealed from is affirmed.

Epstein, Acting P. J., and Curry, J., concurred.

[*]See footnote, *ante*, page 705.