Julie M. Lassa,
Plaintiff-Respondent,

v.

Todd Rongstad and The Valkyrie Group, LLC,
Defendants-Third-Party Plaintiffs-Appellants,†

Does 1-5, in their individual capacities,
Defendants,

American Family Insurance Company,
Intervenor,

v.

Alex Paul,
Third-Party Defendant.

Supreme Court

*No. 2004AP377. Oral argument November 9, 2005.
—Decided July 13, 2006.*

2006 WI 105

(Also reported in 718 N.W.2d 673.)

† Motion for reconsideration denied 10-3-06.

190

For the defendants-third-party plaintiffs-appellants there were briefs by *Michael P. Crooks* and *Peterson, Johnson & Murray, S.C.,* Madison, and oral argument by *Michael P. Crooks.*

For the plaintiff-respondent there was a brief by *Edward R. Garvey, Pamela R. McGillivray,* and *Garvey & Stoddard, S.C.,* Madison, and oral argument by *Pamela R. McGillivray* and *John Skilton.*

An amicus curiae brief was filed by *Brady C. Williamson, Kendall W. Harrison, Brian A. Dillon,* and *LaFollette Godfrey & Kahn,* Madison, on behalf of Wisconsin Manufacturers & Commerce, Wisconsin Newspaper Association, Wisconsin Broadcasters Association, American Civil Liberties Union of Wisconsin Foundation, Wisconsin Realtors Association, Wisconsin Bankers Association, and Wisconsin Builders Association, and there was oral argument by *Brady C. Williamson.*

An amicus curiae brief was filed by *David C. Bender* and *Bender Law Offices,* Madison, on behalf of Wisconsin Democracy Campaign, Inc. and Madison Teachers, Inc.

¶ 1. ANN WALSH BRADLEY, J. This case comes to us on certification from the court of appeals. It requires that we address the propriety of discovery and contempt sanctions. Although the underlying defamation lawsuit has been dismissed with prejudice, we must nevertheless address on appeal issues that arose while the defamation case was pending.

¶ 2. The underlying defamation suit was brought by Julie Lassa against Todd Rongstad and others, including unknown defendants, based on a political mailer that criticized Lassa. An organization headed by Rongstad, the Alliance for Working Wisconsin, sent the mailer. Rongstad, along with his company, the Valkyrie Group, LLC, appeals the circuit court judgment adopting the parties' settlement agreement, under which Lassa agreed to dismiss her claim with prejudice and

Rongstad agreed to pay $65,000 in attorney's fees and forfeitures as sanctions for failing to comply with discovery orders.[1]

¶ 3. Rongstad asserts that the sanctions in this case cannot stand for essentially four reasons:

(A) The circuit court erroneously exercised its discretion by compelling discovery and imposing sanctions over his claim of constitutional privilege before considering whether Lassa's complaint stated a claim upon which relief could be granted;

(B) The circuit court incorrectly applied the constitutional balancing test under *NAACP v. Alabama,* 357 U.S. 449 (1958), and other cases interpreting it;

(C) Rongstad made a "substantiated assertion of privilege" under *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999), a case involving expert witness privilege, thus providing him with justification for failing to comply with the circuit court's discovery orders; and

(D) The severity of the sanctions imposed bore no rational relationship to Rongstad's conduct or to the harm suffered by Lassa.

¶ 4. In addition, Rongstad argues that we should exercise our superintending authority to establish an interlocutory appeal as a matter of right in cases involving threatened sanctions for refusal to disclose information based upon claims of constitutional privilege.

¶ 5. We address the issues raised by Rongstad's arguments as follows:

(A) In defamation cases, circuit courts should ordinarily decide a pending motion to dismiss for failure to

---

[1] Judge Michael N. Nowakowski presided over the circuit court proceedings until a substitution request resulted in a transfer of the case to Judge Maryann Sumi.

state a claim before sanctioning a party for refusing to disclose information that would identify otherwise-anonymous members of an organization. Under the circumstances here, however, the circuit court did not erroneously exercise its discretion in compelling discovery and imposing sanctions before deciding Rongstad's motion to dismiss.

(B) The circuit court properly rejected Rongstad's assertion of privilege under the balancing test of the *NAACP* line of cases because Rongstad failed to make the required preliminary factual showing to support his assertion.

(C) *Alt* has no applicability in this case. The showing that Rongstad had to make was the one required under *NAACP,* not a "substantiated assertion" of evidentiary privilege under *Alt.*

(D) We reject Rongstad's challenge to the severity of the $65,000 in attorney's fees and forfeitures because the circuit court did not set that amount—the parties did by stipulation. Rongstad cannot claim that the amount of $65,000 has no rational relationship to the harm suffered or that the court erroneously exercised its discretion in setting the amount. Rather, the issue of the amount of monetary sanctions was pending before the court when the parties stipulated to $65,000. We also determine that Rongstad's challenge to the sanction of a default judgment on liability is moot under the parties' settlement agreement.[2]

---

[2] Four members of the court are participating in this case. Determinations (A) and (D) above constitute a majority opinion in this case. Three members of the court, Chief Justice Abrahamson, Justice Bradley, and Justice Butler, form the majority in those determinations. *See* concurrence, ¶ 95. In determinations (B) and (C), Chief Justice Abrahamson and Justice Bradley constitute a lead opinion.

¶ 6. In addition, we decline to exercise our superintending authority to establish an interlocutory appeal as a matter of right in defamation cases involving discovery sanctions that raise questions of a constitutional privilege.[3] Accordingly, we affirm the circuit court judgment.[4]

I

¶ 7. The Alliance for Working Wisconsin is a 501(c)(4) organization whose main purpose is "to educate the public about public policy issues related to business, taxes and families in Wisconsin on a national, state and local level." A few days before the general election in November 2002, the Alliance sent a mailer criticizing then-State Representative Lassa for alleged connections to then-State Senate majority leader Chuck Chvala.

¶ 8. Among other things, the mailer said that Lassa wanted to become a state senator, so she "hooked up" with Chvala. The mailer also stated that "[n]obody knows for sure what she had to promise to gain his approval."

¶ 9. At the time, Lassa was running for re-election to the Assembly. Also at that time, Chvala had just been charged with 20 felonies, including extortion, misconduct while in public office, and falsifying reports

---

[3] A majority of the court in this case, Chief Justice Abrahamson, Justice Bradley, and Justice Butler, declines to exercise our superintending authority to establish an interlocutory appeal as a matter of right in defamation cases involving discovery sanctions that raise questions of a constitutional privilege. *See* concurrence, ¶ 95.

[4] A majority of the court in this case, Chief Justice Abrahamson, Justice Bradley, and Justice Butler, agrees that the circuit court judgment must be affirmed. *See* concurrence, ¶ 95 n.1.

to the State Elections Board. The mailer made this apparent by including images of a newspaper clipping and Chvala's booking photograph.

¶ 10. The mailer concluded with this statement:

Extortion, misconduct in public office, pay to play, lying, cheating and stealing. Wisconsin politics has gone completely astray. Please call Julie Lassa . . . and the rest and ask them the tough questions—did you compromise your integrity, did you play along with an illegal game, did you misuse tax dollars to win elections?

And, most importantly, will you please clean up your act?

¶ 11. Lassa filed a defamation action against Rongstad, the Alliance, the Valkyrie Group, and five unknown "Doe" defendants in their individual capacities for their role in publishing and distributing the mailer.[5] At the time, she was considering whether to run for her district's state senate seat, soon to be vacant. She immediately sought to depose Rongstad in order to ascertain the identities of the "Does" involved in the mailer. During Rongstad's deposition, Lassa asked him questions regarding who from the Alliance may have played a role in the mailer. Rongstad objected, refusing to answer a number of these and related questions and asserting a constitutional privilege.

¶ 12. The parties called the court to obtain a ruling on Rongstad's assertion of privilege. Rongstad argued that Lassa's questions pertained to the membership of the Alliance and therefore involved constitutionally-

---

[5] Lassa also named A.M. Mailing Services, Inc., as a defendant. A.M. Mailing's role in the mailer is not relevant to this appeal.

protected rights of free speech and freedom of association under the First and Fourteenth Amendments. He relied on a number of cases, including *NAACP*, in which the United States Supreme Court invalidated a discovery sanction against the NAACP for refusing to disclose membership lists to the State of Alabama in the course of a discovery dispute. Under the principles in those cases, Rongstad contended, Lassa was not entitled to discover the identities of Alliance members.

¶ 13. The court ruled at a hearing the next day, February 4, 2003. It observed that the cases on which Rongstad relied required a preliminary factual showing of a reasonable probability that compelled disclosure of members' identities would subject them to threats, harassment, or reprisals from either government officials or private individuals. The court determined that Rongstad failed to make such a showing. Even if he had, the court determined, the Alliance members' associational rights were outweighed by other interests that the court was required to balance against the members' rights. These other interests, the court explained, included Lassa's interest in clearing her name and the state's interest in preventing fraud and libel, an interest that is heightened during election campaigns.

¶ 14. The court thus overruled Rongstad's constitutional objection to Lassa's questioning. It ordered Rongstad to answer all questions pertaining to the identity of individuals involved in the preparation, funding, or distribution of the mailer.

¶ 15. Although Rongstad's deposition continued, he moved the court to reconsider its February 4 order and submitted an affidavit in an apparent attempt to make the required factual showing. Specifically, Rongstad averred that members of the Alliance had told him

199

that if he was compelled to disclose the identity of members of the organization, they would no longer be interested in participating in the organization or any such organization for fear of public reprisal and potential legal action. The court again determined that Rongstad failed to make the required preliminary factual showing, deeming his affidavit conclusory and insufficient. Thus, the court denied Rongstad's motion to reconsider, and ordered Rongstad to submit to a continued deposition.

¶ 16. Rongstad also sought to challenge the circuit court's February 4 order in the court of appeals. He petitioned the court of appeals for interlocutory relief, claiming the circuit court committed error in rejecting his assertion of privilege under *NAACP.* Ultimately, however, he failed to pursue the appeal, and on March 4, 2003, the court of appeals dismissed his petition for leave to appeal after the time had lapsed for the filing of arguments.

¶ 17. While Rongstad's petition for interlocutory relief was pending, he filed a motion to dismiss for failure to state a claim on February 11, 2003. He argued in the motion that none of the communications in the mailer was capable of defamatory meaning, as required to survive a motion to dismiss. Within two days, the circuit court set a briefing schedule with reply briefs due on March 28. Rongstad did not object to this schedule or request a different schedule.

¶ 18. In the interim, the parties' discovery dispute continued. On February 21, Lassa filed a motion for "sanctions for failure to comply with court-ordered discovery," asserting that Rongstad had failed to comply with the court's previous orders. She requested that Rongstad be held in contempt and that the court impose forfeitures under Wis. Stat. § 804.12(2)(a)4 (2003–04) for

200

any continuing violation of the court's orders.[6] In addition, she requested an award of attorney's fees under § 804.12(2)(b) and a default judgment under § 804.12(2)(a)3.[7]

¶ 19. At a February 28, 2003 hearing on Lassa's motion, her attorney indicated that the governor had called a special election for April 1 to fill the open state senate seat and that Lassa had decided to run for the seat, making it especially important that she discover as soon as possible who was responsible for the mailer in order to clear her name. She asserted that Rongstad

---

[6] All references to the Wisconsin Statutes are to the 2003–04 version.

[7] Wisconsin Stat. § 804.12(2) reads in relevant part as follows:

> Failure to comply with order. (a) If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> . . . .
>
> 3. An order . . . rendering a judgment by default against the disobedient party.
>
> 4. In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical, mental or vocational examination.
>
> (b) In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Wisconsin Stat. § 785.04(1)(c) authorizes the circuit court to impose a daily forfeiture not to exceed $2,000 as a remedial sanction for each day that a contempt of court continues.

201

continued to refuse to answer questions concerning anyone who had funded the Alliance or was a member of the Alliance. Rongstad's counsel reiterated the constitutional issues involved and asserted that, in his view, Rongstad had complied with the court's discovery orders.

¶ 20. Adding to its previous orders, the circuit court ordered Rongstad to disclose the identity of anyone who had contributed $100 or more to the Alliance in 2002. The court postponed hearing Lassa's motion for sanctions, however, because of concerns as to whether Rongstad had been properly served with notice of the motion. Lassa re-filed her motion on March 3, 2003, asserting that Rongstad was in violation of the court's February 28 order in addition to its previous orders.

¶ 21. On March 11, the court heard the motion. It found that Rongstad intentionally failed to comply with the court's orders and that Rongstad was in contempt. The court noted it appeared that Rongstad had lied under oath and that he had given evasive answers designed to avoid providing the information ordered. It imposed a sanction of $32,587 in attorney's fees. In addition, it ordered that beginning March 13, Rongstad would pay a forfeiture in the amount of $1,000 per day until he had fully complied with the court's orders. The court declined to enter a sanction of default judgment against Rongstad, but stated that it would entertain a motion for default judgment on liability issues as a future sanction if Rongstad failed to comply with the court's discovery orders by April 4.

¶ 22. The parties' discovery dispute nonetheless continued and, on April 11, Lassa moved for default judgment against Rongstad on all liability issues, asserting that Rongstad remained in violation of the

court's discovery orders. Rongstad filed a motion for relief from sanctions arguing, in contrast, that he was in compliance with the court's discovery orders because he provided Lassa with some documentation relating to contributions to the Alliance. In addition, he requested that the court address his pending motion to dismiss before proceeding on any other motions.

¶ 23. Consistent with Rongstad's request, the court addressed Rongstad's motion to dismiss before proceeding on the other pending motions. It denied the motion to dismiss on July 8, concluding that the mailer contained communications that were capable of a defamatory meaning.[8]

¶ 24. Several weeks later, on August 15, the circuit court addressed Rongstad's motion for relief from sanctions and Lassa's motion for a default judgment. The court began by thoroughly reviewing the history of the parties' discovery dispute. In a detailed oral decision, the court determined that Rongstad was not in compliance with the discovery orders and that he continued to be in contempt. In addition, the court found that Rongstad's conduct was egregious and in bad faith. The court denied Rongstad's motion for relief from sanctions and granted Lassa's motion for default judgment.

¶ 25. At a subsequent hearing, the court determined that attorney's fees remained an appropriate sanction. Lassa agreed to submit a new statement of attorney's fees for the court's approval, and Rongstad agreed to address the statement and object to fees he deemed unrelated to the discovery dispute. The court

---

[8] By this point in the proceedings, the case had been transferred from Judge Nowakowski to Judge Sumi.

withheld decision on the final amount of attorney's fees and on the proper amount of forfeitures for further court proceedings.

¶ 26. Shortly thereafter, the parties instead submitted a settlement agreement to the court. It provided that Lassa would agree to dismiss the underlying defamation claim with prejudice and that Rongstad would consent to a judgment against him for a stipulated amount of $65,000, with $43,000 considered to be contempt-related attorney's fees and $22,000 considered to be forfeitures payable to the school fund. The agreement also stated that Rongstad reserved certain rights to appeal.

¶ 27. The circuit court entered a judgment in accordance with the parties' agreement. Rongstad appealed, and we accepted the court of appeals' certification of the case pursuant to Wis. Stat. § (Rule) 809.61.

II

¶ 28. Because the parties agreed to dismiss the defamation claim underlying this case, we begin with a brief discussion of why this court has jurisdiction over Rongstad's appeal.[9] Stated succinctly, the reason is straightforward: Rongstad is aggrieved by the final judgment entered upon the parties' settlement agreement because it required him to pay $65,000 in sanctions.

¶ 29. By the time the parties agreed to settle their case and dismiss the underlying defamation claim, the circuit court had already imposed discovery and con-

---

[9] In this discussion, ¶¶ 28–36, Chief Justice Abrahamson and Justice Bradley constitute a lead opinion.

tempt sanctions on Rongstad. More specifically, at the time Rongstad entered into the settlement agreement, the circuit court had imposed over $30,000 in attorney's fees as a discovery sanction, had imposed a $1,000 per day fine for continuing contempt, and had granted Lassa's motion for default judgment. Rongstad was, and remains, aggrieved by the circuit court's orders for discovery and contempt sanctions. Those orders, in turn, are properly before this court as part of Rongstad's appeal from the final judgment entered on the parties' settlement agreement. *See* Wis. Stat. (Rule) § 809.10(4).[10]

¶ 30. Although Rongstad advances several grounds for circuit court error, his central contention is that the sanctions orders were unlawful because they were imposed over his assertion of a constitutional privilege. We must address both this contention and other arguments that Rongstad advances in order to decide the propriety of the sanctions.

---

[10] Wisconsin Stat. (Rule) § 809.10(4) provides as follows:

> Matters reviewable. An appeal from a final judgment or final order brings before the court all prior nonfinal judgments, orders and rulings adverse to the appellant and favorable to the respondent made in the action or proceeding not previously appealed and ruled upon.

The concurrence leaps from the general propositions that an order or judgment must be appealable for an appellate court to exercise jurisdiction and that jurisdiction cannot be conferred by consent to the conclusion that "[a]s such, [Rongstad]'s stipulation preserving certain appellate rights was invalid." Concurrence, ¶ 101. One of the linchpins of the concurrence's conclusion is its determination that Rongstad is not aggrieved from "that" judgment in which he "sought and secured a dismissal with prejudice." *Id.*, ¶ 104. This determination is difficult to fathom in light of the sanctions orders and the simple fact that this case involves only one final judgment.

¶ 31. *NAACP* and *Alt,* two cases on which Rongstad relies, are examples of other instances in which courts were required to address the merits of an assertion of privilege in order to determine the propriety of discovery sanctions. *NAACP,* 357 U.S. at 460–66; *Alt,* 224 Wis. 2d at 84–95. In both cases, the court could not decide whether the sanctions orders were lawful without addressing the assertion of privilege over which the sanctions were imposed. Likewise, here, the validity of the sanctions depends on whether they were properly imposed in light of an asserted privilege.

¶ 32. Also somewhat analogous is *Jandrt v. Jerome Foods, Inc.,* 227 Wis. 2d 531, 597 N.W.2d 744 (1999). In *Jandrt,* sanctions for maintaining a frivolous lawsuit were at issue. *Jandrt,* 227 Wis. 2d at 539. The underlying suit was voluntarily dismissed, but the parties continued to litigate the question of frivolousness. *Id.* at 538. Obviously, the court had to address the merits of maintaining the underlying claim—even though it was dismissed—in order to address the propriety of the sanctions. *See id.* at 572–73.

¶ 33. Although here we need not address the merits of the plaintiff's defamation claim in order to decide the propriety of sanctions, we must address the assertion of privilege, just as in *NAACP* and *Alt.* Rongstad's assertion of privilege is not a defense to Lassa's defamation claim. Rather, it is a defense to the discovery and contempt sanctions.[11]

---

[11] Again, the concurrence reaches a conclusion that is difficult to understand. It concludes that this court lacks jurisdiction to consider Rongstad's assertion of any privilege because the assertion of such a privilege is a defense to Lassa's defamation claim. Concurrence, ¶¶ 94, 96. The concurrence conflates a defense to the defamation claim with a defense to the discovery and contempt sanctions. In any event, both

¶ 34. Of course, an order or judgment must be appealable for an appellate court to exercise jurisdiction, and "consent of the parties involved cannot confer jurisdiction where none exists." *Heritage Mut. Ins. Co. v. Thoma,* 45 Wis. 2d 580, 587, 173 N.W.2d 717 (1970). Nonetheless, parties sometimes settle issues in a controversy, as here, such that the only question or questions remaining are ripe for appeal. Similarly, issues presented on appeal are often at least partly the product of one or more stipulations in the circuit court. *See, e.g., Petta v. ABC Ins. Co.,* 2005 WI 18, ¶ 32, 278 Wis. 2d 251, 692 N.W.2d 639 (in which this court's decision was based, in part, on a stipulation that the plaintiffs had not been made whole by a lump-sum settlement); *see also, e.g., Strenke v. Hogner,* 2005 WI 25, ¶¶ 7–8, 279 Wis. 2d 52, 694 N.W.2d 296 (parties stipulated to liability but disputed damages); *Weber v. White,* 2005 WI 63, ¶ 5, 272 Wis. 2d 121, 681 N.W.2d 137 (parties stipulated that one party was 100% negligent in causing an accident).

¶ 35. Parties may not manufacture artificial issues for appeal. Moreover, a judgment or order must be "final" as defined by rule in order to be appealable as a matter of right. Wis. Stat. § (Rule) 808.03(1); *see also*

---

*NAACP v. Alabama,* 357 U.S. 449 (1958), and *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999), demonstrate that this conclusion is incorrect.

Similarly difficult to understand is the concurrence's belief that this court has jurisdiction over some but not all of the issues presented. *See* concurrence, ¶¶ 94–96. The concurrence does not satisfactorily explain how this court has jurisdiction over some issues but not others, even though all of the issues initially stem from Lassa's now-dismissed defamation claim.

*Cascade Mountain, Inc. v. Capitol Indem. Corp.*, 212 Wis. 2d 265, 269, 569 N.W.2d 45 (Ct. App. 1997) (party "cannot, by stipulating to the entry of a conditional judgment, obtain a mandatory appeal of an interlocutory order"). Here, however, the parties' settlement and the judgment entered upon it do not implicate manufactured issues. They also do not run afoul of the finality requirement.[12]

¶ 36. Having briefly addressed why this court has jurisdiction over Rongstad's appeal, we turn to the merits of Rongstad's arguments. His arguments raise issues involving sanctions for a party's failure to comply with discovery orders and a related contempt of court. Appellate courts ordinarily review circuit court decisions pertaining to such matters for an erroneous exercise of discretion. *Schultz v. Sykes,* 2001 WI App 255, ¶ 8, 248 Wis. 2d 746, 638 N.W.2d 604. However, we independently determine any underlying questions of law. *See Oliveto v. Circuit Court,* 194 Wis. 2d 418, 429, 533 N.W.2d 819 (1995); *Evans v. Leubke,* 2003 WI App 207, ¶ 16, 267 Wis. 2d 596, 671 N.W.2d 304. The lawfulness of the discovery and contempt sanctions in this case ultimately turns on a question of law subject to independent appellate review: whether Rongstad made the required preliminary factual showing that meets the standard for asserting a constitutional privilege under *NAACP. See Vultaggio v. Yasko,* 215 Wis. 2d 326, 330, 572 N.W.2d 450 (1998); *State v. Bentley,* 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996).

---

[12] The settlement agreement and judgment are structured such that regardless of whether Rongstad or Lassa prevails on appeal, no further litigation between them will ensue in this case.

## III

### A

¶ 37. We begin by addressing Rongstad's assertion that the circuit court erroneously exercised its discretion by compelling discovery and imposing sanctions over his claim of constitutional privilege before considering whether Lassa's complaint stated a claim upon which relief could be granted. Rongstad argues that, in light of the constitutional questions raised by his assertion of privilege, the court should have first decided the motion to dismiss.

¶ 38. Rongstad is joined in this argument by amici American Civil Liberties Union of Wisconsin Foundation, Wisconsin Newspaper Association, Wisconsin Broadcasters Association, Wisconsin Manufacturers & Commerce, Wisconsin Realtors Association, Wisconsin Bankers Association, and Wisconsin Builders Association.[13] They assert that, given the constitutional rights at stake, a public figure such as Lassa should not be allowed discovery in a defamation action until any pending motion to dismiss has been resolved.

¶ 39. Lassa does not seem to oppose such a procedure in general. Rather, she maintains that based on the particular facts here, the circuit court did not

---

[13] The American Civil Liberties Foundation of Wisconsin submitted the amicus brief it originally filed in the court of appeals, and it also joined in another amicus brief filed after this court accepted certification of the case. Lassa moves to strike the ACLU's original brief, asserting that the ACLU has, in effect, filed two amicus briefs. We agree with Lassa and discourage such practice by amici curiae in future cases. However, because our decision would be the same regardless of any consideration given to the ACLU's original brief, we choose to deny Lassa's motion.

209

erroneously exercise its discretion by failing to decide Rongstad's motion to dismiss before imposing discovery sanctions.

¶ 40. Cases like the one before us test the bounds of the rights to free speech and freedom of association in the face of other important rights and interests. "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP,* 357 U.S. at 462. Likewise, the decision to remain anonymous is an aspect of the freedom of speech protected by the First Amendment. *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 342 (1995).

¶ 41. At the same time, individual citizens, including candidates for public office, have an interest in being free from defamation. Those who have been defamed have an important interest in clearing their names. In addition, the state has a legitimate interest in preventing fraud and libel. *McIntyre,* 514 U.S. at 349. This interest "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large." *Id.* Stated another way, the voting public has a weighty interest in accurate information about candidates for public office. The right of voters to get accurate information is essential to the election process. While non-defamatory, protected speech may often further the voters' interest, defamatory speech assuredly undermines it.[14]

---

[14] There is no shortage of cases involving claims of defamation by candidates for public office against those who have criticized them. *See, e.g., Tatur v. Solsrud,* 174 Wis. 2d 735, 498 N.W.2d 232 (1993); *D'Amato v. Freeman Printing Co.,* 38

¶ 42. Certainly, a defamation plaintiff should not be able to employ the rules of discovery to obtain the identity of an anonymous political speaker simply by filing a complaint that is facially unsustainable. The speaker has most likely chosen anonymity for a reason. If that reason is consistent with First Amendment principles, the use of discovery to uncover the speaker's identity may chill the exercise of the right to free speech. Such a use of the discovery process also violates the basic principle that litigants are not entitled to discovery that causes unreasonable annoyance, embarrassment, or oppression. *See* Wis. Stat. § 804.04(3); *Paige K.B. ex rel. Peterson v. Steven G.B.*, 226 Wis. 2d 210, 232, 594 N.W.2d 370 (1999).[15]

¶ 43. Yet, the constitution cannot work as an absolute bar to a plaintiff's interest in discovering the identity of a speaker who has actually defamed her. If it did, anonymous speakers would be free to make false statements causing harm to others no matter how malicious or damaging. Freedom of speech has its limits. It does not embrace defamation. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245–46 (2002).

¶ 44. One way to reconcile all of these competing rights and interests, according to Rongstad and the amici, is to require that circuit courts decide whether a defamation complaint states a claim on which relief may be granted before imposing sanctions for the refusal to disclose information based on the type of

---

Wis. 2d 589, 157 N.W.2d 686 (1968); *Frinzi v. Hanson*, 30 Wis. 2d 271, 140 N.W.2d 259 (1966).

[15] We note that there is no real dispute in this case that Rongstad and the Alliance were the only source of the information that Lassa was seeking to discover.

constitutional privilege Rongstad has asserted. Such a procedure, they argue, helps ensure protection of the constitutional rights at stake.

¶ 45. On a motion to dismiss, the court must determine whether a communication is "capable of a defamatory meaning." *Starobin v. Northridge Lakes Dev. Co.,* 94 Wis. 2d 1, 10, 287 N.W.2d 747 (1980). This means that if the communication cannot reasonably be understood as defamatory, then the plaintiff has failed to state a claim, and the motion to dismiss must be granted. *Id.; see also Tatur v. Solsrud,* 174 Wis. 2d 735, 740, 498 N.W.2d 232 (1993); *Frinzi v. Hanson,* 30 Wis. 2d 271, 276, 140 N.W.2d 259 (1966).

¶ 46. Few appellate courts have been asked to determine whether such a procedure should be followed, although the question has reached at least one other state supreme court. In *Doe v. Cahill,* 884 A.2d 451 (Del. 2005), the Delaware Supreme Court was confronted with the question of what procedure to follow when a public figure defamation plaintiff seeks to discover the identity of an anonymous speaker criticizing the plaintiff via internet postings.

¶ 47. The Delaware court was presented with a range of possible procedures to use in order to strike the proper balance between the competing rights and interests. The court explained:

> Before this Court is an entire spectrum of "standards" that could be required, ranging (in ascending order) from a good faith basis to assert a claim, to pleading sufficient facts to survive a motion to dismiss, to a showing of prima facie evidence sufficient to withstand a motion for summary judgment, and beyond that, hurdles even more stringent.

*Cahill,* 884 A.2d at 457.

212

¶ 48. The court thoroughly described the particular concerns with which it was faced:

> We are concerned that setting the standard too low will chill potential posters from exercising their First Amendment right to speak anonymously. The possibility of losing anonymity in a future lawsuit could intimidate anonymous posters into self-censoring their comments or simply not commenting at all. A defamation plaintiff, particularly a public figure, obtains a very important form of relief by unmasking the identity of his anonymous critics. The revelation of identity of an anonymous speaker "may subject [that speaker] to ostracism for expressing unpopular ideas, invite retaliation from those who oppose her ideas or from those whom she criticizes, or simply give unwanted exposure to her mental processes." Plaintiffs can often initially plead sufficient facts to meet the good faith test . . . even if the defamation claim is not very strong, or worse, if they do not intend to pursue the defamation action to a final decision. . . .
>
> Indeed, there is reason to believe that many defamation plaintiffs bring suit merely to unmask the identities of anonymous critics. As one commentator has noted, "[t]he sudden surge in John Doe suits stems from the fact that many defamation actions are not really about money." "The goals of this new breed of libel action are largely symbolic, the primary goal being to silence John Doe and others like him." This "sue first, ask questions later" approach, coupled with a standard only minimally protective of the anonymity of defendants, will discourage debate on important issues of public concern as more and more anonymous posters censor their online statements in response to the likelihood of being unmasked.

*Id.* at 457 (footnotes omitted; citations omitted).

¶ 49. Given these concerns, the *Cahill* court concluded that "even the more stringent motion to dismiss standard, the middle option in the spectrum of standards from which we may choose, falls short of providing sufficient protection to a defendant's First Amendment right to speak anonymously." *Id.* at 458. Thus, the court held that "before a defamation plaintiff can obtain the identity of an anonymous defendant through the compulsory discovery process he must support his defamation claim with facts sufficient to defeat a summary judgment motion." *Id.* at 460.

¶ 50. Although we share the *Cahill* court's concerns and think them fully applicable to the case at bar, we reach a somewhat different conclusion. It appears that Delaware, unlike Wisconsin, does not require particularity in the pleading of defamation claims. *See id.* at 458; *cf.* Wis. Stat. § 802.03(6).[16] The court in *Cahill* noted that "even silly or trivial libel claims can easily survive a motion to dismiss where the plaintiff pleads facts that put the defendant on notice of his claim, however vague or lacking in detail these allegations may be." *Cahill,* 884 A.2d at 458.

¶ 51. In addition, the Delaware court emphasized that one of the most important aspects of testing a defamation claim by summary judgment is that the claim must be "capable of a defamatory meaning" in

---

[16] Wisconsin Stat. § 802.03 provides in relevant part:

Pleading special matters . . . .

. . . .

(6) Libel or slander. In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their publication and their application to the plaintiff may be stated generally.

order to survive summary judgment. *Id.* at 463. This, of course, is the same inquiry that is the focus of a motion to dismiss a claim for defamation in Wisconsin. *See, e.g., Starobin,* 94 Wis. 2d at 10.

¶ 52. Accordingly, we determine that under Wisconsin law, requiring the circuit court to decide a motion to dismiss before compelling disclosure and imposing sanctions best addresses the concerns expressed in *Cahill.* When faced with an assertion of constitutional privilege against disclosure of information identifying otherwise-anonymous organization members, the circuit court should decide a pending motion to dismiss for failure to state a claim before sanctioning the party for refusing to disclose that information.

¶ 53. Having determined that, prospectively, this is the procedure that circuit courts should ordinarily follow, we nonetheless agree with Lassa that the circuit court did not erroneously exercise its discretion here even though it imposed some discovery sanctions before addressing Rongstad's motion to dismiss.

¶ 54. Early in the litigation, Rongstad informed the circuit court that he intended to bring a motion to dismiss. He did not, however, argue that the court was required to decide the motion before discovery proceeded. When Rongstad filed his 17–page motion and supporting brief, he also advanced no such argument. Likewise, when the circuit court made its discovery rulings and when it initially imposed sanctions on March 11, 2003, Rongstad did not present the argument.

¶ 55. The court issued a briefing schedule on Rongstad's motion to dismiss within two days of the date that Rongstad filed the motion, February 11, 2003.

215

Under the briefing schedule, reply briefs were due approximately six weeks later, yet Rongstad did not file any objection to the schedule or request an accelerated schedule. In addition, he did not file any objection when his insurer moved on February 19 to intervene and stay the merits of the case pending resolution of coverage issues.

¶ 56. At the very earliest, it was not until April 30, 2003, that Rongstad first apprised the court of the argument he now advances, that the court was required to decide his motion to dismiss before compelling discovery. On that date, Rongstad filed a letter with the court in which he requested that it address his motion to dismiss before resolving any other pending motions because this would "eliminate the need for any further action." In our view, however, even this April 30 letter did not apprise the circuit court of the argument Rongstad now makes.

¶ 57. In any event, by the time of Rongstad's April 30 letter, the court had already compelled discovery and ordered sanctions. It then decided his motion to dismiss before proceeding to impose further sanctions. The court imposed no additional sanction until after it denied the motion.

¶ 58. In short, Rongstad did not raise his argument that the circuit court was required to address his motion to dismiss before it compelled discovery until after the court imposed discovery sanctions. Moreover, the argument that the constitutional dimension of the parties' discovery dispute mandated this course of action was a relatively novel one considering existing law at the time.[17] Given all of the circumstances, the court

---

[17] The dissent imparts a spin to both the facts and the law. Contrary to what it first insinuates over the course of nine

did not erroneously exercise its discretion in compelling discovery and imposing some sanctions without first deciding Rongstad's motion.[18]

paragraphs, *see* dissent, ¶¶ 124–129, 139, 169–170, and then expressly concludes based on several more paragraphs of nuanced explanation, *see id.,* ¶¶ 172–178, there is no real indication in the record of Rongstad's argument until April 30, 2003, at the earliest. By suggesting otherwise, the dissent elevates the "silk purse from a sow's ear" aphorism to new levels. The dissent apparently thinks that if it underlines the words "motion to dismiss" enough times, it can summon facts from the record that do not exist. *See id.,* ¶¶ 124–126, 128–129, 169.

Likewise, none of the legal authorities that the dissent cites (or that Rongstad cited in the circuit court) would have apprised the circuit court that Rongstad was arguing the court must address his motion to dismiss before imposing discovery and contempt sanctions. Those authorities do not address whether circuit courts should decide a pending dispositive motion in a defamation case before resolving discovery disputes. As we have indicated in the body of this opinion, *Doe v. Cahill,* 884 A.2d 451 (Del. 2005), which was decided more than two years after the circuit court denied Rongstad's motion to dismiss, appears to be one of the few cases to address such an issue.

The dissent relies, for example, on the Law Note for Judges on defamation that is found in the pattern jury instructions. *See* dissent, ¶ 173 (citing Wis. JI—Civil 2500). Rongstad cited the Law Note in his brief in support of his motion to dismiss and provided the Law Note to the circuit court along with his April 30 letter. The Law Note, however, simply acknowledges that the initial substantive inquiry in a defamation case is usually whether the words at issue are capable of defamatory meaning, a question for the trial judge that is normally presented by a motion to dismiss. Wis. JI—Civil 2500, at 3. The Law Note provides no guidance as to how this procedure in the usual defamation case should interact with discovery disputes, let alone the type of discovery dispute here.

[18] Here, as the circuit court recognized, the resolution of the discovery dispute was time-sensitive given the imminent special

¶ 59. We turn to Rongstad's argument that the circuit court incorrectly applied the constitutional balancing test under cases such as *NAACP.* The United States Supreme Court's decision in *NAACP* has come to stand for a balancing test that applies to cases in which an organization or its members or contributors assert a First Amendment privilege in the face of compelled disclosure of member identities or related information. *See, e.g., Black Panther Party v. Smith,* 661 F.2d 1243, 1267–68 (D.C. Cir. 1981); *Crocker v. Revolutionary Communist Progressive Labor Party,* 533 N.E.2d 444, 447–48 (Ill. Ct. App. 1988).[19] As the following discussion of *NAACP* and other cases shows, the party seeking to assert the privilege must make a preliminary factual showing that at least demonstrates a reasonable probability of an actual chilling effect on First Amendment rights.

¶ 60. In *NAACP,* the attorney general of Alabama brought suit against the NAACP alleging that it was unlawfully conducting business in that state. *NAACP,* 357 U.S. at 452. The issue on appeal involved the constitutionality of a large monetary contempt sanction against the NAACP for its failure to comply with a

---

election for the state senate seat that Lassa had decided to seek. In a similarly time-sensitive case, the court and parties would obviously need to be mindful of expediting any briefing or proceedings necessary to decide a motion to dismiss.

[19] The decision in *Black Panther Party v. Smith,* 661 F.2d 1243 (D.C. Cir. 1981), was subsequently vacated by the United States Supreme Court on mootness grounds, *see Moore v. Black Panther Party,* 458 U.S. 1118 (1982), but it continues to be cited as providing a sound analysis of the balancing test. *See, e.g., International Action Ctr. v. United States,* 207 F.R.D. 1, 3 n.6 (D.D.C. 2002).

discovery order requiring disclosure of its membership lists. *Id.* at 453.

¶ 61. The Court first recognized that the order "must be regarded as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association." *Id.* at 462. In determining that the order was likely to chill NAACP members' associational rights, the Court referred to the NAACP's "uncontroverted showing that on past occasions revelation of the identity of rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* The Court then weighed the likelihood of such a restraint on the exercise of members' rights against the state's asserted interests in obtaining disclosure of member identities. *See id.* at 463–65.[20]

¶ 62. Relying on *NAACP,* the Court in *Buckley v. Valeo,* 424 U.S. 1 (1976), elaborated on what is required under the first part of the balancing test, this time in the context of contributions to political parties. In *Buckley* the Court explained that there must be a factual showing sufficient to demonstrate a "reasonable probability" of threats, harassment, or reprisals, and the Court gave examples of the proof necessary:

> The evidence offered need show only a reasonable probability that the compelled disclosure . . . will subject [contributors] to threats, harassment, or reprisals from either Government officials or private parties.

---

[20] Much as in *NAACP,* the Court in *Bates v. City of Little Rock,* 361 U.S. 516 (1960), spoke of "substantial uncontroverted evidence that public identification of persons in the community as members of the [NAACP] had been followed by harassment and threats of bodily harm." *Id.* at 524.

> The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient.

*Id.* at 74; *see also Black Panther Party,* 661 F.2d at 1267–68 ("[T]he litigant seeking protection need not prove to a certainty that its First Amendment rights will be chilled by disclosure. It need only show that there is some probability that disclosure will lead to reprisal or harassment.").

¶ 63. The Court was thus careful in *Buckley* to ensure that the burden on the party seeking to assert a privilege was not insurmountably high. At the same time, the Court recognized, "[w]here it exists[,] the type of chill and harassment identified in *NAACP v. Alabama* can be shown." *Buckley,* 424 U.S. at 74.

¶ 64. Thus, "[a] subjective fear of reprisal is insufficient to invoke first amendment protection against a disclosure requirement." *Dole v. Local Union 375,* 921 F.2d 969, 973 (9th Cir. 1990). "The proof offered must be 'objective'—an allegation of 'apprehension' or subjective deterrence of membership or contribution is not sufficient." *O'Neal v. United States,* 601 F. Supp. 874, 879 (N.D. Ind. 1985) (citations omitted); *see also Laird v. Tatum,* 408 U.S. 1, 13–14 (1972) ("[a]llegations of a subjective 'chill' " are not an adequate substitute for a claim of specific present objective harm . . . .).

¶ 65. The court in *Brock v. Local 375,* 860 F.2d 346 (9th Cir. 1988), aptly summarizing much of the applicable case law, observed as follows:

> Many courts have grappled with the sufficiency of such a showing. A factor emphasized in each of those

decisions is the need for objective and articulable facts, which go beyond broad allegations or subjective fears.

*Brock,* 860 F.2d at 350 n.1 (citations omitted).

¶ 66. Here, Rongstad relies primarily on his own affidavit, consisting of a total of five short statements. Specifically, he averred as follows:

> 1. That I am a board member and president of the Alliance for Working Wisconsin.
>
> 2. That in that position, I had numerous conversations with members of the association over the last several years and recently specifically related to the lawsuit at issue.
>
> 3. That as a board member and president of the association, I and the Alliance have previously guaranteed confidentiality with respect to the identity of members and have honored that throughout the course of my work with the Alliance.
>
> 4. That members have told me that if I am compelled to disclose the identity of members of the organization, that they will no longer be interested in participating in the organization or any such organization, for fear of public reprisal and potential legal action.
>
> 5. That disclosure of the names and the attendant loss of confidentiality will likely ruin my business and force me to find a new career.

¶ 67. Rongstad's affidavit is insufficient to establish the required preliminary showing under *NAACP* and its progeny. The affidavit provides no evidence of particular instances of past or present threats, harassment, or reprisals. *See Buckley,* 424 U.S. at 74; *NAACP,*

357 U.S. at 462. It also does not indicate a pattern of threats or specific manifestations of public hostility against the Alliance or similar groups.

¶ 68. Although a record of past harassment or reprisals is not always necessary, Rongstad has not otherwise established a reasonable probability of such chilling effects. At most, he established precisely what is ordinarily deemed insufficient: a general statement of subjective fear of reprisal without any basis in objective, particularized facts. Only one of the five statements in his affidavit is directly related to the substance of the required showing, and that statement establishes only that some unspecified number of members have told him they will no longer be interested in participating in the Alliance or other organizations like it based on general fears of reprisal.

¶ 69. We view the case of *Friends Social Club v. Secretary of Labor,* 763 F. Supp. 1386 (E.D. Mich. 1991), as persuasive in light of the circumstances here. In *Friends Social Club,* organization members submitted affidavits stating predictions and fears of harassment, including recrimination by political opponents. *Id.* at 1394. The affidavits suggested that disclosure of members' identities might discourage members from further participation. *Id.* The court in *Friends Social Club,* like the circuit court here, deemed such affidavits conclusory and insufficient. *Id.* at 1395. According to the *Friends Social Club* court, the affidavits fell "far short of sustaining a *prima facie* case" because they did not "set forth an objective factual basis for [the] subjective fears of reprisal from any particular person." *Id.*

¶ 70. Conversely, a comparison of the facts here to a number of other cases in which the factual showing was deemed sufficient underscores that Rongstad has failed to make the required showing. *See Brown v.*

*Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 98–99 (1982) (evidence of threatening phone calls and hate mail, burning of group's literature, destruction of members' property, police harassment, firing of shots at the group's office, and termination of members' employment was sufficient); *Familias Unidas v. Briscoe,* 619 F.2d 391, 395–96, 399 (5th Cir. 1980) (evidence of previous arrests, letters warning of liability for fines, and other public opprobrium and threats of reprisals, was sufficient); *Wisconsin Socialist Workers 1976 Campaign Comm. v. McCann,* 433 F. Supp. 540, 547–48 (E.D. Wis. 1977) (series of affidavits showing potential contributors' reluctance to contribute, specific instances of harassment, and widespread surveillance were sufficient); *In re Bay Area Citizens Against Lawsuit Abuse,* 982 S.W.2d 371, 376–77 (Tex. 1998) (testimonial and other evidence was sufficient when it demonstrated specific instances when individuals opposed to group had boycotted affiliated members or encouraged others to do the same); *Crocker,* 533 N.E.2d at 447–48 (allegations of surveillance, intimidation, job firings, disciplinary actions, and other reprisals were sufficient where the party seeking discovery had position of authority over party asserting privilege).[21]

[21] *But cf. Britt v. Superior Court,* 574 P.2d 766, 782 (Cal. 1978) (in which the majority of the court in a four-to-three decision seemingly ignored the need for a preliminary factual showing and the dissent stated that the majority had, without precedent, "expanded *NAACP* to a general abstract principle that the disclosure of any information about associational activities constitutes an impermissible violation of the right to associate" (Richardson, J., dissenting)); *see also Pollard v. Roberts,* 283 F. Supp. 248, 258 (E.D. Ark. 1968) (seeming not to require factual evidence that individuals had been subjected to reprisals and instead determining that it would be naïve not to

¶ 71. Because we determine that Rongstad failed to make the required preliminary factual showing, we need not reach the question of whether there are compelling interests here that would outweigh a constitutional privilege. The circuit court correctly rejected Rongstad's assertion of privilege under *NAACP* and its progeny. Rongstad's assertion of privilege was therefore not an impediment to discovery sanctions in this case.[22]

¶ 72. Before turning to Rongstad's next argument, we pause to address the dissent's treatment of *NAACP* and its progeny. Deeming those cases inapplicable, the dissent dispenses with decades of constitutional law. Dissent, ¶ 158; *see also* dissent, ¶ 146. Worth noting is that this is the case law on which Rongstad has principally relied throughout this litigation. Tellingly, the dissent finds it necessary to evade these cases and their requirement of a preliminary factual showing in order to reach its result.

¶ 73. As window dressing for its result, the dissent then raises the specter of "SLAPP" suits, deeming this case a "SLAPP suit masquerading as a defamation

recognize that disclosure of identities would subject at least some of them to reprisals), *aff'd per curiam, Roberts v. Pollard*, 393 U.S. 14 (1968).

[22] The dissent inaccurately portrays our opinion as applying the deferential erroneous exercise of discretion standard to the central constitutional issue in this case. *See* dissent, ¶ 110. As we have already explained, the lawfulness of the discovery and contempt sanctions in this case ultimately turns on a question of law subject to independent appellate review: whether Rongstad made the required preliminary factual showing that meets the standard for asserting a constitutional privilege under *NAACP. See, e.g., Vultaggio v. Yasko*, 215 Wis. 2d 326, 330, 572 N.W.2d 450 (1998); *State v. Bentley*, 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996).

case."[23] Dissent, ¶ 108; *see also* dissent, ¶¶ 159–160. In characterizing this case as a "SLAPP" suit, the dissent seemingly takes on the role of advocate. Rongstad has not characterized this case as a SLAPP suit, has not advanced that we should address it as such, and has not asserted that addressing it as such makes a difference in the constitutional calculus.[24] Unlike the dissent, we address the arguments that Rongstad makes, and we adhere to the applicable law.

## C

¶ 74. We next turn briefly to Rongstad's argument that he made a "substantiated assertion of privilege" under *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999). He argues that *Alt* should apply where a defendant in a defamation action asserts a privilege against disclosure based on the First Amendment.

¶ 75. In *Alt,* this court concluded that a witness has a qualified privilege to refuse to provide expert testimony, absent compelling circumstances. *Id.* at 89, 92. We stated that "[a]lthough the circuit court should not rely on the judgment of the attorneys involved for their self-interested determination that a privilege exists, a substantiated assertion of privilege is substantial justification for failing to comply with an order to provide or permit discovery." *Id.* at 94 (citation omit-

[23] "SLAPP" is an acronym for "Strategic Lawsuit Against Public Participation." *Vultaggio,* 215 Wis. 2d at 359 (Bradley, J., dissenting).

[24] We note that the dissent also wanders into the legislative role. It calls upon the legislature to adopt anti-SLAPP statutes even though it concedes that "[u]ntil this case, the term SLAPP suit had been relatively unheard of in Wisconsin jurisprudence." Dissent, ¶¶ 161–162.

ted). Thus, under *Alt,* a bald assertion of an evidentiary privilege to refuse to provide expert testimony will not suffice. Rather, the assertion must be "substantiated."

¶ 76. The court in *Alt* did not define what is meant by a "substantiated" assertion of privilege against providing expert testimony. It is apparent, however, that by requiring that the assertion be substantiated, the court was seeking to effectuate the necessary balance between the right of expert witnesses to be free from testifying against their will and the needs of the court and litigants for testimony. *See id.* at 88. The requirement of a "substantiated" assertion of the evidentiary privilege discourages illegitimate invocation of the privilege.

¶ 77. In cases involving discovery orders in the face of an assertion of constitutional privilege as here, the balancing test under *NAACP* governs. That balance, which involves considerations different from those in *Alt,* is effectuated by the standards set forth in *NAACP* and the cases interpreting it. Thus, we determine that *Alt* has no applicability here. The showing that Rongstad had to make was the one required under *NAACP* and its progeny, not a "substantiated assertion" of an evidentiary privilege under *Alt.*

D

¶ 78. We now turn to Rongstad's assertion that the severity of the sanctions in this case bore no rational relationship to his conduct or to any harm suffered by Lassa. More specifically, Rongstad argues that the $65,000 in monetary sanctions ($43,000 in attorney's fees and a $22,000 forfeiture payable to the school fund) "bears no rational relationship to Rongstad's refusal to

disclose political associations for a mere two months" in light of his claim of privilege and his attempt to seek interlocutory appeal. We reject this argument.

¶ 79. Rongstad's argument incorrectly assumes that the $65,000 in monetary sanctions is an amount of sanctions set by the circuit court, when in fact it is the amount to which the parties stipulated in their settlement agreement. The circuit court never made a final ruling on the amount of monetary sanctions. Rather, the parties stipulated to this amount of sanctions while the issue of the amount of monetary sanctions was still pending before the court. We will not review the amount of monetary "sanctions" agreed to by the parties for an erroneous exercise of circuit court discretion. The circuit court never had the opportunity to exercise its discretion as to the amount of monetary sanctions it ultimately deemed proper.

¶ 80. Rongstad also asserts that a sanction of a default judgment on liability issues is too severe and bears no rational relationship to the harm suffered. We question whether the parties' settlement agreement and the judgment entered pursuant to that agreement reflect an intent to permit Rongstad to appeal the propriety of the judgment on liability.[25] Regardless, we

---

[25] The parties' settlement agreement states that Rongstad "shall have the right to pursue an appeal *with respect to the attorney's fees and forfeitures* on First Amendment grounds . . . ." (Emphasis added.) The judgment entered on the agreement, while purporting not to waive "any appellate rights," also provides as follows:

> The defendants intend to appeal the appropriateness *of the fees and forfeitures* under the First Amendment, *Alt,* and whether the Courts were justified in the award, and any other applicable legal

227

determine that the agreement and the judgment entered pursuant to the agreement, which dismissed Lassa's claim with prejudice, bar Rongstad from challenging the propriety of the default judgment on liability. The effect of the default judgment on liability is moot under the parties' agreement and the judgment dismissing Lassa's claim with prejudice.

¶ 81. We once again pause to address the dissent, which protests that "it is draconian to subject Rongstad to the heavy, heavy financial sanctions at issue in this case." Dissent, ¶ 183. Lost on the dissent is that the parties stipulated to the amount of monetary sanctions.

¶ 82. More importantly, in labeling the sanctions "draconian," the dissent turns a blind eye to facts of record that may have justified a circuit court award of monetary sanctions equal to or greater than the amount to which the parties agreed. For example, the circuit court judge who initially presided in this case observed: "Seldom have I seen such an abuse." The court also found that Rongstad had lied under oath, was "highly evasive," and had "engaged in a well-planned effort to cover up" his activities. Similarly, the circuit court judge who later presided concluded that Rongstad's conduct was egregious and in bad faith.

¶ 83. The dissent carefully avoids giving any truck to these facts, instead portraying Rongstad as the victim of a biased circuit court, of a "shrewd and savvy" legislator (Lassa), and now of this court. Dissent, ¶¶ 129, 153, 162, 164 & n.11, 170, 172, 179, 181–185. Yet, nothing in the record calls into question the impar-

theories. Rongstad and The Valkyrie Group retain the right to appeal the contempt ruling *on all issues for the stipulated amount of $65,000* with $43,000 in contempt related attorney's fees and $22,000 in forfeitures payable to the School Fund.

(Emphasis added.)

tiality of the circuit court. Likewise, we have taken pains in this opinion to avoid portraying either Lassa or Rongstad in an unfavorable light and to avoid suggesting an improper motive on the part of one party or the other. Perhaps if the dissent had more facts or more law on its side, it could have done the same. Instead, the dissent brings the following quotation to mind: "When you have the facts on your side, argue the facts. When you have the law on your side, argue the law. When you have neither, holler."

## E

¶ 84. Finally, we turn to address the question of whether we should exercise our superintending authority to establish an interlocutory appeal as a matter of right in defamation cases involving discovery sanctions that raise questions of a constitutional privilege. Our exercise of the superintending power is limited to situations in which the "necessities of justice" require it. *Arneson v. Jezwinski,* 206 Wis. 2d 217, 231, 556 N.W.2d 721 (1996). Moreover, requiring automatic grants of interlocutory appeal pursuant to this power is generally disfavored. *State ex rel. Hass v. Wisconsin Court of Appeals,* 2001 WI 128, ¶ 24, 248 Wis. 2d 634, 636 N.W.2d 707.

¶ 85. Rongstad argues that this case should be controlled by *Arneson,* in which this court concluded that the court of appeals should as a matter of course grant a petition for an interlocutory appeal from a circuit court order denying a state official's claim of qualified immunity in a 42 U.S.C. § 1983 action. *Arneson,* 206 Wis. 2d at 219–20. We determined that such a

229

petition would always fall within the criteria for leave to appeal under Wis. Stat. § (Rule) 808.03(2)(a) and (b).[26] *Id.* at 229.

¶ 86. In other contexts, however, the court has declined to exercise its superintending authority to require interlocutory appeals under circumstances that may be viewed as equally compelling to circumstances such as those here. *See Hass,* 248 Wis. 2d 634, ¶¶ 2, 20; *State v. Jenich,* 94 Wis. 2d 74, 288 N.W.2d 114, *modified on reconsideration,* 94 Wis. 2d 74, 97A-97B, 292 N.W.2d 348 (1980). In *Jenich,* for example, we declined to direct the court of appeals to hear permissive appeals denying motions to dismiss based on double jeopardy claims despite the "serious constitutional questions" raised by such claims. *Jenich,* 94 Wis. 2d at 97A n.1, 97B. Rather, we were content to urge the court of appeals to carefully exercise its discretion in considering whether to hear such appeals. *Id.* at 97B.

¶ 87. Here, we follow our approach in *Jenich,* mindful of the rule that automatic grants of interlocutory appeal are generally disfavored. Mandatory interlocutory review of orders that compel or deny discovery when an assertion of constitutional privilege is raised in

---

[26] Wisconsin Stat. § (Rule) 808.03(2) provides:

Appeals by permission. A judgment or order not appealable as a matter of right under sub. (1) may be appealed to the court of appeals in advance of a final judgment or order upon leave granted by the court if it determines that an appeal will:

(a) Materially advance the termination of the litigation or clarify further proceedings in the litigation;

(b) Protect the petitioner from substantial or irreparable injury; or

(c) Clarify an issue of general importance in the administration of justice.

a defamation case is not foreordained by *Arneson* or otherwise dictated by the necessities of justice. *Cf. Reise v. Board of Regents*, 957 F.2d 293, 295 (7th Cir. 1992) ("[E]ven orders to produce information over strong objections based on privilege are not appealable, despite the claim that once the cat is out of the bag the privilege is gone.").

¶ 88. Although defamation cases like the one before us may raise serious constitutional questions, the constitutional questions raised in double jeopardy cases are equally serious. The constitutional rights at stake are adequately protected by the court of appeals' careful consideration of petitions for leave to appeal and by any other review procedure available, such as a petition for a supervisory writ. "[O]rdinary judicial review procedures suffice as long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly." *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 781–82 (2004).[27]

---

[27] We note that Rongstad did not exhaust all available procedures for appellate review. As previously mentioned, for example, Rongstad initially sought interlocutory relief in the court of appeals from the circuit court's February 4, 2003, order, asserting that the circuit court erred by rejecting his assertion of privilege under *NAACP.* Ultimately, however, the court of appeals dismissed Rongstad's petition for leave to appeal from the February 4 order after he failed to file any argument. The court of appeals concluded "it appears that Rongstad no longer wishes to seek interlocutory review . . . ."

Likewise, at the March 11, 2003 sanctions hearing, the circuit court observed as follows:

> Mr. Rongstad failed to pursue his further opportunity, which was to ask the Court of Appeals to address the merits of my order on an interlocutory appeal basis. . . . It was, in effect, abandoned.

231

¶ 89. Accordingly, we decline to exercise our superintending authority to establish a right to interlocutory appeal as Rongstad requests. Nevertheless, given the important constitutional issues raised and the consequent need for a timely resolution, we urge the court of appeals to carefully weigh whether there is a need for interlocutory appeal in a given case. Such an appeal may be necessary to protect a party from "substantial or irreparable injury," one of the criteria for testing the appropriateness of an interlocutory appeal under § (Rule) 808.03(2). We trust that the court of appeals will carefully exercise its discretion to grant or deny leave to appeal or other relief as appropriate.

## IV

¶ 90. In sum, we hold as follows:

(A) In defamation cases, circuit courts should ordinarily decide a pending motion to dismiss for failure to state a claim before sanctioning a party for refusing to

> And that having been said, Mr. Rongstad's most recent claims that he is going to seek vindication in the Court of Appeals and that that is what explains his conduct and his defiance of this Court's order likewise falls on rather hollow footing. Instead, what it appears virtually certain to be is simply another in the variety of steps that Mr. Rongstad has taken in this litigation to seek delay and to avoid his responsibilities under the law.

In addition, it appears that Rongstad chose not to utilize other mechanisms for interlocutory relief. Lassa sets forth the following background facts in her brief:

> On April 1, 2003, the Court of Appeals denied a second petition for leave to appeal and motion for temporary relief filed by Mr. Rongstad seeking review of the court's February 28 and March 11, 2003 orders because the Court does not take permissive appeal[s] on oral orders. Those sanctions orders were reduced to [a] written order on April 2, 2003. . . . Mr. Rongstad did not seek leave for appeal of the April 2, 2003 order.

disclose information that would identify otherwise-anonymous members of an organization. Under the circumstances here, however, the circuit court did not erroneously exercise its discretion in compelling discovery and imposing sanctions before deciding Rongstad's motion to dismiss.

(B) The circuit court properly rejected Rongstad's assertion of privilege under the balancing test of the *NAACP* line of cases because Rongstad failed to make the required preliminary factual showing to support his assertion.

(C) *Alt* has no applicability in this case. The showing that Rongstad had to make was the one required under *NAACP*, not a "substantiated assertion" of evidentiary privilege under *Alt*.

(D) We reject Rongstad's challenge to the severity of the $65,000 in attorney's fees and forfeitures because the circuit court did not set that amount—the parties did by stipulation. Rongstad cannot claim that the amount of $65,000 has no rational relationship to the harm suffered or that the court erroneously exercised its discretion it setting the amount. We also determine that Rongstad's challenge to the default judgment on liability is moot under the parties' settlement agreement.

¶ 91. In addition, we decline to exercise our superintending authority to establish an interlocutory appeal as a matter of right in defamation cases involving discovery sanctions that raise questions of a constitutional privilege. Accordingly, we affirm the circuit court judgment.

*By the Court.*—The judgment of the circuit court is affirmed.

¶ 92. JON P. WILCOX, N. PATRICK CROOKS, and PATIENCE DRAKE ROGGENSACK, JJ., took no part.

¶ 93. LOUIS B. BUTLER, JR., J. (*concurring*). Todd Rongstad (Rongstad) seeks to assert First Amendment protections before this court in response to Julie Lassa's (Lassa) defamation claim. The action before us is not about Lassa's defamation claim or Rongstad's First Amendment defense, however. This case is about the power of the circuit court to enforce the orders that it lawfully enters during litigation that is pending before it. When viewed in the proper perspective, the resolution of this matter is relatively simple and straightforward.

¶ 94. The majority and the dissent are determined to reach and decide matters that were dismissed as part of a settlement agreement that was accepted by the circuit court. The majority chooses to reach Rongstad's assertions of privilege in determining whether discovery sanctions are appropriate for his refusal to comply with discovery orders. The dissent chooses to reach Rongstad's assertions of privilege as part of deciding the defamation claim. I am not so inclined. The defamation claim has been dismissed, a result sought by Rongstad. That dismissal includes the defenses to the claim, including any assertions of privilege by Rongstad. The dismissal of the defamation claim was part of the settlement agreement between the parties, approved by the court. It's over. The merits of the underlying defamation action are simply not before us. The assertions of privilege are not before us. To reach out and decide the merits of that dismissed claim and any defense Rongstad had to it would allow Rongstad to have his cake, and eat it too. We should not become so engaged.

234

¶ 95. The majority concludes that in defamation cases, circuit courts should ordinarily decide a pending motion to dismiss for failure to state a claim before sanctioning a party for refusing to disclose information that would identify otherwise-anonymous members of an organization. Majority op., ¶¶ 5, 90. Because I agree that this approach should be followed by the circuit courts in the future, I concur with and join that portion of the opinion. Likewise, I concur with and join that portion of the decision in which we decline to exercise our superintending authority to establish a right to interlocutory appeal as Rongstad suggests. *Id.,* ¶¶ 6, 89, 91. I also concur with and join that portion of the opinion which holds that under the circumstances here, the circuit court did not erroneously exercise its discretion in compelling discovery and imposing sanctions before deciding Rongstad's motion to dismiss. *Id.,* ¶¶ 5, 90. I finally concur with and join that portion of the opinion that rejects Rongstad's challenge to the severity of the $65,000 in attorney's fees and forfeitures because the parties stipulated to that amount.[1] *Id.*

¶ 96. Because the circuit court dismissed the underlying defamation claim with prejudice, however, I conclude that this court lacks jurisdiction to consider the merits of Lassa's defamation claim, and Rongstad's assertion of any privilege with respect to that claim, including whether the circuit court properly imposed sanctions for a violation of pretrial discovery orders.

¶ 97. It is axiomatic that in "all cases of appeal or error, there must have been a proceeding, in good faith, an adjudication in an inferior court. This inferior court

---

[1] Three members of this court, Chief Justice Abrahamson, Justice Bradley and I, all agree that sanctions in the amount of $65,000 are therefore proper in this matter.

235

must have passed upon the case . . . ." *Webster v. Stadden,* 8 Wis. 83, *225, *228, 37 N.W. 316 (1859). "[P]arties cannot, either by failure to raise the question or by consent, confer jurisdiction upon an appellate court to review an order which is not appealable." *Szuszka v. City of Milwaukee,* 15 Wis. 2d 241, 243, 112 N.W.2d 699 (1961); *see also Heritage Mut. Ins. Co. v. Thoma,* 45 Wis. 2d 580, 586–87, 173 N.W.2d 717 (1970). This court simply has no jurisdiction to entertain an appeal from a nonappealable order. *Gilbert v. Hoard,* 201 Wis. 572, 573, 230 N.W. 720 (1930); *see also Hargrove v. Peterson,* 65 Wis. 2d 118, 122, 221 N.W.2d 875 (1974) ("When an order is not appealable, this court lacks subject-matter jurisdiction and any attempted appeal must be dismissed.").

¶ 98. Prior to the reorganization of the court system in 1977, Wis. Stat. § 817.10 provided that any judgment or order was reviewable by a "party aggrieved." *Mutual Serv. Cas. Ins. Co. v. Koenigs,* 110 Wis. 2d 522, 526, 329 N.W.2d 157 (1983). That provision was omitted from the 1977 revision of the rules and statutes because it was considered to merely state a fundamental and well-understood concept upon which standing to appeal was predicated:

> "The elimination of the phrase in the revisions of the statutes and rules was not intended to change the concept that a person had to be aggrieved by a judgment or order before he could appeal." Martineau and Malmgren, *Wisconsin Appellate Practice,* sec. 601 (1978).

*Id.* A person is aggrieved if the judgment bears directly and injuriously upon his or her interests, and the person must be adversely affected in some appreciable manner. *Weina v. Atlantic Mut. Ins. Co.,* 177 Wis. 2d

341, 345, 501 N.W.2d 465 (Ct. App. 1993); *Ford Motor Credit Co. v. Mills*, 142 Wis. 2d 215, 217–18, 418 N.W.2d 14 (Ct. App. 1987).

¶ 99. In this action, there is no question that Rongstad has been aggrieved by the sanctions imposed by the circuit court for contempt-related attorney's fees and contempt-related forfeitures.[2] Those sanctions, along with the question of whether the circuit court should decide a pending motion to dismiss for failure to state a claim before sanctioning a party for refusing to comply with the circuit court's discovery orders, are therefore properly before this court.

¶ 100. The underlying merits of Lassa's defamation claim and Rongstad's assertion of privilege with respect to both that claim, as well as to the validity of the discovery sanctions, are an altogether different matter. The parties entered into a settlement, approved by the circuit court, which dismissed the underlying defamation claim with prejudice. Majority op., ¶¶ 26–27. While Rongstad has been aggrieved by the contempt sanctions for refusing to comply with lawful court orders, he simply cannot assert that he has been aggrieved from a judgment in which he prevailed.[3]

---

[2] Once again, it must be noted that Rongstad agreed to be sanctioned, in part to secure a dismissal of the defamation claim against him. This matter is complicated by his attempt to preserve certain issues on appeal as part of the stipulation, notwithstanding the dismissal of the underlying defamation claim.

[3] The majority curiously asserts that Rongstad is "aggrieved" by the final judgment because he entered into a "settlement agreement" that required him to pay $65,000 in sanctions. Majority op., ¶ 28. He agreed to the judgment, which included dismissal of the defamation claim against him, and he agreed to be sanctioned in that amount.

237

Wisconsin Stat. § 809.10(4) does not provide Rongstad with a vehicle for appealing the judgment of dismissal entered in his favor.[4]

¶ 101. It matters not that Rongstad sought to preserve certain of his appellate rights by way of stipulation. *See Coleman v. Percy,* 96 Wis. 2d 578, 587, 292 N.W.2d 615 (1980) ("It follows, therefore, that the [parties] lacked authority to create by contract a greater right of judicial review than what they enjoyed by statute."). Parties simply cannot confer jurisdiction upon an appellate court by consent, and an order or judgment must be appealable for an appellate court to exercise its appellate jurisdiction. As such, his stipulation preserving certain appellate rights was invalid.

¶ 102. This matter should be decided on the same footing as this court's decisions in *Lawrence v. MacIntyre,* 48 Wis. 2d 550, 553, 180 N.W.2d 538 (1970), and

---

[4] The case of *NAACP v. Alabama,* 357 U.S. 449 (1958), did not involve the dismissal of the underlying claim such as occurred here. Instead, the NAACP chose to challenge the circuit court's final judgment of civil contempt against the organization in the context of opposing an action to enjoin the organization from conducting further activities in the state. *Id.* at 452–53, 466–67. Similarly, in *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999), the underlying negligence action had not been dismissed when the issue of contempt arose and was appealed.

That is precisely what should have occurred here. Rongstad could have litigated the underlying defamation claim, any defenses to that claim, and the validity of the discovery orders had he chosen to do so. Instead, Rongstad abandoned, unintentionally perhaps, any opportunity to pursue that defamation claim and any First Amendment defenses to it, as well as the validity of the discovery orders related to the defamation claim, when he agreed to the dismissal of the defamation claim, and the judgment of dismissal was entered by the circuit court.

*Gallagher v. Schernecker,* 60 Wis. 2d 143, 148–49, 208 N.W.2d 437 (1973). In *Lawrence,* 48 Wis. 2d at 553, the appellants appealed from an order dismissing the plaintiff's complaint, an order in their favor. This court appropriately dismissed the appeal, ruling that the parties were not "aggrieved." *Id.* "We think it elementary that a party may not appeal from a judgment in his favor." *Id.* (citation omitted).

¶ 103. Similarly, in *Gallagher,* 60 Wis. 2d at 148–49, this court held that where an appellant seeks an order vacating an arbitration award and secures such an order, "[a]s the moving party who prevailed, he is not an aggrieved party with the right to appeal the order vacating the award."[5] *See also Edlin v. Soderstrom,* 83 Wis. 2d 58, 64, 264 N.W.2d 275 (1978) (where the complainant had sought the relief granted by other portions of the judgment, and as to those parts of the judgment he was not an aggrieved party and could not appeal); *Thoma,* 45 Wis. 2d at 588 (a "defendant cannot appeal from the judgment which grants the nonsuit he sought and secured").

¶ 104. Rongstad sought and secured a dismissal with prejudice of Lassa's defamation claim. He is not an aggrieved party as to that judgment. This court is therefore deprived of jurisdiction to decide the merits of that action and any orders entered as part of that action, including any defenses to it. Consequently, I would not reach the questions of whether the circuit court incorrectly applied the constitutional balancing test under *NAACP v. Alabama,* 357 U.S. 449 (1958), or

---

[5] Because respondent cross-appealed from the order vacating the award, which was appealable as to the respondent, the issues were before the court and resolved on the merits. *Gallagher v. Schernecker,* 60 Wis. 2d 143, 149, 208 N.W.2d 437 (1973).

whether Rongstad made a "substantiated assertion of privilege" under *Burnett v. Alt,* 224 Wis. 2d 72, 94, 589 N.W.2d 21 (1999).[6] I respectfully decline to join those portions of the majority opinion. If Rongstad wanted this court to reach these issues, he should have litigated them on the merits before the circuit court.

¶ 105. Rongstad was found in contempt by the circuit court for intentionally failing to comply with the court's orders to provide discovery to Lassa. "The court noted it appeared that Rongstad had lied under oath and that he had given evasive answers designed to avoid providing the information ordered." Majority op., ¶ 21. The circuit court found Rongstad's conduct to be "egregious and in bad faith." Majority op., ¶ 24. Sanctions, including attorney's fees, were ultimately imposed against Rongstad for his contempt of court.[7] While the amount of the sanctions imposed is properly before this court, there is no doubt that Rongstad intentionally failed to comply with the circuit court's discovery orders. Majority op., ¶ 21. Rongstad simply has no right to willfully disobey a lawful court order just because he disagrees with it.

---

[6] Both the majority opinion and the dissent have chosen to address some of the First Amendment concerns raised by Rongstad in this appeal. This would be entirely appropriate, had this matter been fully litigated at the circuit court level to conclusion. As the circuit court has dismissed the underlying claim with prejudice, any relevance regarding First Amendment concerns would be now limited to the question of whether the circuit court should assess attorneys' fees against Rongstad, as opposed to whether the circuit court should have ordered sanctions in the first instance. *See* Wis. Stat. § 804.12(2)(b).

[7] It is not clear whether those sanctions were imposed pursuant to Wis. Stat. §§ 785.04(1) and 804.12(2)(a)4., or whether they were imposed pursuant to Wis. Stat. § 804.12(2)(b).

¶ 106. Rongstad had to abide by the terms of the discovery order, even if erroneously entered, until he either succeeded in reversing the order in the trial court or through the applicable review process. *See State v. Orethun,* 84 Wis. 2d 487, 490, 267 N.W.2d 318 (1978) ("Where a court has jurisdiction over the subject matter and the parties, the fact that an order or judgment is erroneously or improvidently rendered does not justify a person in failing to abide by its terms.") (citation omitted); *Anderson v. Anderson,* 82 Wis. 2d 115, 118–19, 261 N.W.2d 817 (1978); *cf. Kett v. Cmty. Credit Plan, Inc.,* 222 Wis. 2d 117, 128, 586 N.W.2d 68 (Ct. App. 1998) ("A voidable judgment . . . has the same effect and force as a valid judgment until it has been set aside."). The only way he could refuse to follow the order was if that order was found to be void and therefore did not need to be obeyed. *See State v. Campbell,* 2006 WI 99, ¶¶ 42, 49, 294 Wis. 2d 100, 718 N.W.2d 649. Because the underlying matter was dismissed as part of the settlement agreement entered into by Rongstad, the discovery order was never held to be void. The circuit court was thus fully justified in enforcing its order.

¶ 107. For the foregoing reasons, I respectfully concur.

¶ 108. DAVID T. PROSSER, J. (*dissenting*). This is a SLAPP suit masquerading as a defamation case.[1] A SLAPP suit represents an attempt to chill First Amendment rights by bringing a tort suit, such as defamation. Like a defamation case, this suit implicates important issues of constitutional law.

---

[1] SLAPP is an acronym for Strategic Lawsuit Against Public Participation. *Vultaggio v. Yasko,* 215 Wis. 2d 326, 359, 572 N.W.2d 450 (1998) (Bradley, J., dissenting); *Briggs v. Eden Council,* 969 P.2d 564, 565 n.1 (Cal. 1999).

241

¶ 109. The United States Supreme Court has pre-scribed the standard for reviewing limitations on politi-cal speech, declaring that "[w]hen a law hinders core political speech, we apply 'exacting scrutiny' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995). Although this case involves review of judicial determinations affecting speech rather than the application of a speech-restrictive statute, the standard we apply should be no less rigorous. *New York Times Co. v. Sullivan,* 376 U.S. 254, 265 (1964).

¶ 110. The majority sees it differently. It does not apply exacting scrutiny to the circuit court's decision to compel discovery and impose sanctions. Instead, it applies the deferential erroneous exercise of discretion standard, as though this standard adequately safe-guards First Amendment freedoms. I cannot agree.

## I. BACKGROUND

¶ 111. The facts and context are critical to the proper resolution of the constitutional issues in this case, and thus they are reported at some length.

¶ 112. The plaintiff, Julie Lassa, is a Democratic state senator from Stevens Point. She was elected to the Assembly in 1998, 2000, and 2002, and elected to the Senate in a special election on April 29, 2003.[2]

¶ 113. In 2002, shortly before the general elec-tion, the defendant, Todd Rongstad, caused a mailing to be sent to voters in Representative Lassa's 71st Assem-bly District, as well as some voters in other areas that make up the 24th Senate District. The mailing con-

---

[2] State of Wisconsin Blue Book at 66 (2005–06 ed.).

sisted of an oversized two-sided postcard. One side of this mailing shows a colored photograph of Lassa jumping, with her shoes off, in the rotunda of the State Capitol, in front of a group of students. The smiling face of then-Senator Charles Chvala is superimposed, like multiple colored masks, on the students' heads.

¶ 114. The bottom of this first side reproduces a Milwaukee Journal Sentinel headline reporting, "Chvala charged with extortion, State Senator faces 20 felony counts, up to 85 years in prison." At the top of the jumping picture in bold type is the name "Julie Lassa." At the bottom of the picture is the phrase "When Chuck Said Jump . . ."

¶ 115. On the other side of the card the following text is printed over the photograph of Senator Chvala's mug shot:

> Lassa Wanted To Be A State Senator, So She Hooked Up With Chuck Chvala.
>
> *A Tale of Wisconsin Politics*
>
> One day, Julie Lassa decided she wanted to be a state senator. So she asked Senate Leader Chuck Chvala if she could, and he said okay.
>
> *Nobody knows for sure what she had to promise to gain his approval.* But Chuck wanted a more compliant senator, so he got to work.
>
> What he did best was fundraise with unsubtle threats. Populist Chvala even sponsored a Lassa fundraiser at the state's ritziest country club.
>
> Chvala didn't care much for dissent. And he was giddy with the idea of Senator Julie.
>
> *Just like the old days when party bosses made decisions for us all.*

243

But then Lassa's mentor was charged with 20 felonies and *things fell apart.*

The End?

Extortion, misconduct in public office, pay to play, lying, cheating and stealing. Wisconsin politics has gone completely astray. Please call Julie Lassa . . . and the rest and ask them the tough questions—did you compromise your integrity, did you play along with an illegal game, did you misuse tax dollars to win elections?

And, most importantly, will you please clean up your act?

¶ 116.　This side of the card also carries two small photographs of Lassa as well as a space for a mailing address. In two places, the mailing indicates that it was produced by "The Alliance for a Working Wisconsin" (the Alliance) with a post office box in Waunakee, Wisconsin.

¶ 117.　The mailing was designed to embarrass Lassa by linking her to Senator Chvala, who had recently been charged with several campaign-related offenses. The apparent motive for the mailing was to discourage Lassa from running for the state senate should the 24th District senate seat become vacant, or to weaken her candidacy if she made such a race.

¶ 118.　The 2002 mailing had no effect on Lassa's election to the Assembly, as she was re-elected with 73 percent of the vote, a higher percentage than she received in 2000.

¶ 119.　At that time, the 24th Senate District was represented by Senator Kevin Shibilski, also a Democrat. Senator Shibilski had angered some members of his party, including Senator Chvala, when he voted for a Republican-sponsored budget "repair" bill in 2002. The residual effect of his vote surfaced later in the year

when Senator Shibilski was defeated by Barbara Lawton in a statewide Democratic primary for lieutenant governor.

¶ 120. After the 2002 election, Senator Shibilski was designated by Governor-elect James Doyle as the new Secretary of Tourism. He resigned his senate seat in early January, which led eventually to a special election to fill the vacancy.

¶ 121. On January 16, 2003, Lassa filed suit against Rongstad, alleging defamation. Lassa's complaint stated in part:

> [1.] Lassa has not made a decision whether to run for [Shibilski's] vacated seat as of this [date].

> [2.] Lassa was not a candidate for State Senate as alleged in the text of the mailer-postcard and Lassa did not ask for help from Chvala to run for the State Senate, a seat then occupied by Democratic Senator Kevin [Shibilski] . . .

> [3.] The message falsely asserts to citizens receiving the mailer-postcard a) that Lassa was running for the Senate; b) that she was doing so at the demand of Chvala who was, at the time of the mailing, under indictment on 20 felony counts; and c) that Lassa was involved in the conduct that led to the indictment of Senator Chvala.

> [4.] The bottom of the mailer-postcard shows a picture of Lassa directly to the right of the following text that is superimposed over what appears to be the booking information from the Dane County Sheriff's office for the arrest of Chvala:

>> Extortion, misconduct in public office, pay to play, lying, cheating and stealing. Wisconsin politics has gone completely astray. Please call Julie Lassa . . . and the rest and ask them the tough questions—

did you compromise your integrity, did you play along with an illegal game, did you misuse tax dollars to win elections? And, most importantly, will you please clean up your act?

[5.] The message falsely and maliciously asserts to her constituents that Lassa engaged in "extortion," "misconduct in public office," "pay to play," as well as "lying, cheating and stealing."

[6.] Lassa has not engaged in such illegal activity . . . and is not involved in the Chvala matter in any way.

[7.] The mailer-postcard was published out of ill will and an intent to destroy Lassa's political reputation in the community and any opportunity she might have to run for the State Senate and other political positions in the future.

[8.] Defendants have caused to be communicated and published a false and malicious statement regarding Plaintiff's conduct.

[9.] Plaintiff has been injured by the false and malicious communication by lowering her in the estimation of her constituents and other citizens of the state.

[10.] As a direct and proximate result of the defamatory statements, Plaintiff has suffered compensatory damages, including but not limited to loss of future earnings and opportunities, humiliation, damage to her reputation, emotional distress, pain and suffering and costs incurred in bringing this action, all in amounts to be determined.

¶ 122. The summons issued to Rongstad advised him that he had 45 days after service to file a written answer to the complaint. However, on January 16, the

same date as the filing, the plaintiff's attorney, Edward Garvey, issued a subpoena duces tecum commanding Rongstad to appear at Garvey's office on January 30 for a deposition. The subpoena also commanded Rongstad to bring "any and all documents relating to the Complaint filed in this matter."

¶ 123. On January 23, Rongstad's attorney, Michael P. Crooks, advised Attorney Garvey that the January 30 date was not convenient, either for him or for defendant Rongstad. Having received no response by January 27, Attorney Crooks filed a motion with the court for a protective order postponing the deposition. In this motion, Attorney Crooks asserted that the action and subpoena were not served upon the defendant until January 22, the day before he wrote to Attorney Garvey. Thus, he claimed, the plaintiff had "subpoenaed Defendant Rongstad for a deposition scheduled 39 days before he is even required to file an answer."

¶ 124. In the January 27 brief accompanying the motion, Attorney Crooks asked for time to answer the complaint. "Defendants also anticipate filing a *motion to dismiss* the summons and complaint. Again, forcing Defendant Rongstad to undergo a deposition prior to a resolution of these preliminary matters subjects him to annoyance, oppression, undue burden and *expense*." (Emphasis added.)

¶ 125. In a second filing on January 28, Attorney Crooks swore in an affidavit:

That as mentioned in the initial moving papers, your affiant plans on filing a *motion to dismiss* the complaint in its entirety, as the same fails to state a claim upon which relief can be granted. [The] *defendants request an adjournment of any depositions until after the Court*

247

*has an opportunity to hear said motion.* (Emphasis added.)

¶ 126. On January 28, Defendant Rongstad also filed an affidavit with the court, explaining why January 30 was inconvenient and stating, "[Y]our affiant has ordered his attorneys to file a *motion to dismiss* the case, based upon his belief that it is meritless and done for political purposes, rather than for pursuit of actual damages." (Emphasis added.)

¶ 127. On January 29, 2003, Dane County Circuit Judge Michael N. Nowakowski heard the motion to quash Attorney Garvey's subpoena for the January 30 deposition. Attorney Crooks began his presentation with the observation that "within the lawsuit I think we're . . . entering real dangerous grounds. If the Court allows this to go forward, the Court is essentially sanctioning a system where we put process ahead of what is purported to be a legitimate lawsuit."

¶ 128. Rongstad's attorney argued that the purpose of the suit was political. "[W]e intend to file a *motion to dismiss* the entire lawsuit within a week to 10 days. . . . [To] subject [Rongstad] to the deposition process under the guise of a legitimate lawsuit is not right." (Emphasis added.)

¶ 129. The circuit court was not impressed. The court chastised counsel for not knowing whether he and Rongstad, who was not present, were available for a January 31 deposition, yet it refused counsel's request to call his office. The court said:

> I will make this point with respect to some of the contentions that you've raised. There is no basis under the law to say that simply because someone has only recently been served and represents that they intend to file a *motion to dismiss* the case that they are therefore immune from or not subject to having their deposition

taken. That simply is not a principle of law that applies. (Emphasis added.)

. . . .

The other thing that is apparent . . . is that there are other defendants who have not been served, have not been named and have only been identified as Does that Mr. Garvey and his client are entitled to try and find out who they are . . . .

¶ 130. Ultimately, the parties agreed to a deposition on Monday, February 3, 2003. At that deposition, Rongstad declined to answer certain questions on constitutional grounds, on the advice of counsel.

¶ 131. At a hearing the following day, February 4, Rongstad's attorney stressed that Rongstad accepted full responsibility for the mailing, but he objected to comprehensive questioning about membership in Rongstad's organization and the speed with which the discovery was proceeding.

¶ 132. In rebuttal, Attorney Garvey argued: "There is a special election that is coming up. We now know that that seat is vacant, and therefore, I think it is extremely important that we get to the bottom of this as quickly as possible."[3]

¶ 133. The court declared:

This is a private lawsuit in which an individual citizen seeks injunctive relief and damages on the basis of her allegations that she has been defamed . . . . The suit asserts common law rights . . .

. . . [T]he interests to be weighed are different in this setting than in the pure government enforcement arena.

_____

[3] Governor Doyle did not issue an executive order for an April 1 primary and an April 29 special election until February 19, 2003. *See* Executive Order No. 4 (Feb. 19, 2003).

¶ 134. The court distinguished *NAACP v. Alabama,* 357 U.S. 449 (1958), cited by Rongstad, on grounds that Lassa represented a different kind of interest than the state government of Alabama:

> The purely private interest of any citizen in his or her good name has long been recognized as worthy of the careful protection of the law. While the plaintiff by voluntarily injecting herself into the public spotlight by becoming a candidate for public office is expected to live with certain attacks on her good name that a purely private person might not have to suffer, she does not forfeit entirely the law's protection.
>
> . . . .
>
> Were I to sustain the objection to the questions at issue . . . the practical effect would be to grant these unknown participants in the alleged defamation . . . the absolute immunity that the Supreme Court was so careful to eschew.
>
> The objections are overruled, and the defendant *Rongstad is ordered to answer all questions inquiring as to the names and behavior of any other persons involved in the preparation, funding or distribution of the mailing.* (Emphasis added.)

¶ 135. Early on, the court rejected Rongstad's request to file briefs on the issues, and, after its ruling, the court rejected a stay so that Rongstad could seek a supervisory writ.[4] The court underlined its position: "The suggestion that [Rongstad] and his counsel have been denied the opportunity to make presentation on the two issues that were alluded to by Mr. Crooks is simply unfair, is an unfair characterization of what

---

[4] Rongstad promptly asked the court of appeals to stay the circuit court's order "to answer all questions inquiring as to the

transpired ... when I was unexpectedly confronted with this issue."

¶ 136. On February 6, after "roughly 10 hours" and over 400 pages of deposition, Rongstad asked the court to hear a motion for reconsideration. Attorney Crooks argued that Lassa claimed that she was defamed "in the context of her position as a State Representative and potentially a State Senator. She is an officer of the State of Wisconsin, and I believe as a result of that that the state action cases are applicable to the Court's analysis." Moreover, he said, the court's order itself constituted "state action."

¶ 137. The court denied the motion for reconsideration and stated, "[I]t's a sad day in our political system when somehow this kind of activity is covered up and evaded. Seldom have I seen such an abuse."

¶ 138. On February 10, Rongstad filed an answer to the complaint. For affirmative defenses, Rongstad asserted that the complaint failed to state a claim upon which relief may be granted; the statements in the postcard were not defamatory; the statements in the postcard were substantially true; the defendant's conduct was privileged; and the statements, because they related to Lassa's "actions as a public official," were entitled to greater protection from liability than if they had been made against a private individual.

---

names and behavior of any other persons involved in the preparation, funding or distribution of the mailing." On February 4, the court of appeals denied the petition. On April 1, the court of appeals denied Rongstad's request for leave to appeal and his motion for temporary relief. On the same day, April 1, the court of appeals denied Rongstad's request for a supervisory writ. The majority characterizes Rongstad's actions as failure "to pursue the appeal," majority op., ¶ 16, and failure to "exhaust all available procedures for appellate review." Majority op., ¶ 88, n.27.

¶ 139. The following day, February 11, Attorney Crooks filed a motion to dismiss, together with a 15–page brief discussing the constitutional principles and facts supporting the motion.[5]

¶ 140. On February 18 the court heard argument on a motion by Attorney Garvey for a protective order to quash a subpoena to depose Lassa. The court granted the motion, delaying any deposition of Lassa until after March 15.

¶ 141. On February 21 Lassa moved for sanctions. She requested that Rongstad be held in contempt and that the court impose forfeitures for any continuing violation of the court's orders. Hearings were held on February 28 and March 11. The court imposed a sanction of more than $32,000 in attorney fees and ordered, beginning March 13, that Rongstad pay a forfeiture of $1000 per day until he complied with the court's orders.

¶ 142. On April 1, Lassa handily won a Democratic primary election for the senate, defeating Attorney Alex Paul, who was ultimately exposed as having financed the 2002 mailing. In expensive primary advertising, Paul promoted themes that paralleled the postcard, prompting Attorney Garvey to publicly threaten to depose Paul's campaign to determine whether Paul had anything to do with the mailing. *Paul, Lassa squabble over ads,* Stevens Point J., Mar. 21, 2003. In the April 29 special election, Lassa was elected to the senate, winning more than 61 percent of the vote.

---

[5] The majority plays up the circuit court's February 13 briefing schedule, which gave Lassa only one month to answer Rongstad's brief on the motion to dismiss. Majority op., ¶¶ 17, 55. Lassa filed her reply brief on March 14. By that time, the court had held Rongstad in contempt, imposed attorney fees, and ordered that Rongstad pay a forfeiture of $1000 per day until he complied with the court's orders.

¶ 143. On July 8, 2003, long after the election, a different Dane County judge denied the defendant's February 11 motion to dismiss. On August 15 the court granted Senator Lassa's motion for default judgment. By stipulation, the amount at stake in this review is $65,000.

## II. ANALYSIS

¶ 144. This case was commenced as a defamation suit by a public official who was criticized during a contested election campaign. Because of its facts, the case is at the epicenter of First Amendment principles, inasmuch as it involves not only the heavily protected freedom to criticize government officials, *Herbert v. Lando,* 441 U.S. 153 (1979) and *Sullivan,* but also the right to facilitate political speech through the expenditure of money, *Buckley v. Valeo,* 424 U.S. 1, 19, 22–23, 47–51, 54, 57–58 (1976); the right to anonymous speech, *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 342 (1995); the right to associate with others for expression purposes and the right to privacy in those associations, *NAACP,* 357 U.S. at 462.

¶ 145. Because this case involves review of judicial determinations affecting political speech, this court must apply exacting scrutiny to these determinations. *Sullivan,* 376 U.S. at 265. From the outset, before it acceded to Lassa's request to compel Rongstad to disclose the membership of the Alliance, the circuit court should have ensured that its discovery order was "narrowly tailored to serve an overriding state interest." *McIntyre,* 514 U.S. 347.

¶ 146. The majority identifies two state interests, the interest of a candidate for public office in being free from defamation, and the state's interest in ensuring accurate information during election campaigns. Major-

ity op., ¶ 41. The majority then reaches the surprising conclusion that the order requiring Rongstad to disclose the membership of the Alliance, who would then be named as defendants in a highly publicized defamation suit, did not chill First Amendment rights. Majority op., ¶¶ 67–68. As a result, the majority concludes that it need not balance the competing interests to determine whether the circuit court's decision to compel disclosure was narrowly tailored. Majority op., ¶ 71. I cannot agree.

¶ 147. First, although I agree that affording candidates a means to relief from defamation and ensuring accurate information during election campaigns are legitimate state interests, I disagree that compelling Rongstad to disclose the membership of the Alliance advanced either interest. Second, I believe that compelling Rongstad to disclose the membership information, effectively guaranteeing that the unmasked individuals would become defendants in this lawsuit, substantially chilled First Amendment rights. Consequently, I conclude that the circuit court could not have concluded that the state interests outweighed Rongstad's assertion of privilege without first determining that Lassa's claim was capable of a defamatory meaning. Thus, I conclude the order compelling disclosure was not narrowly tailored and cannot support the imposition of sanctions.

A. No Compelling State Interest Justified Disclosure

¶ 148. Lassa's suit implicates two state interests, the interest of a candidate for public office in being free from defamation, and the state's interest in ensuring accurate information during election campaigns. Majority op., ¶ 41. At the time the circuit court ordered Rongstad to disclose the membership of the Alliance, neither interest was compelling.

254

## 1. The State Interest in Protecting Citizens Against Defamation

¶ 149. Two features of Lassa's claim dilute the strength of the state's interest in protecting citizens from defamation. First, during an election campaign the state's interest in preventing defamation is counterbalanced by its interest in promoting political discourse. *See Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 (1971). A court's duty to protect speech involving a public figure is heightened during elections. *See Roy,* 401 U.S. at 272 (stating that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office"). Courts must be solicitous of the reality that "[t]he clash of reputations is the staple of election campaigns," and that campaigning necessarily entails bruised reputations.

¶ 150. As the Supreme Court explained:

It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast and the advantages derived are so great that they more than counterbalance the inconvenience of the private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare. The public benefit from publicity is so great and the chance of injury to private character so small that such discussion must be privileged.

*Id.* (quoting *Coleman v. MacLennan,* 98 P. 281, 286 (Kan. 1908)).[6]

---

[6] The United States Supreme Court has expressed doubts as to "whether there [even] remains some exiguous area of defamation against which a candidate may have full recourse [during

255

¶ 151. Second, Lassa's suit presents a defamation claim by a public figure against a media or non-media defendant, *"which will always involve a conditional constitutional privilege." See* Wis JI—Civil 2500 at 9 (emphasis added).[7] The central principles pertaining to public figure defamation were summarized by this court in *Torgerson v. Journal/Sentinel, Inc.,* 210 Wis. 2d 524, 563 N.W.2d 472 (1997):

> The First Amendment imposes a constitutional privilege on the publication of statements about public figures, even when those statements are false and defamatory. The privilege, however, is conditional, and the condition is the absence of actual malice. The requirement that actual malice be proven is a minimal accommodation of the reputational interests of public figures and the community's interest in unfettered public debate.
>
> . . . .
>
> Proof of actual malice requires a showing that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard for its truth.

*Id.* at 535–36.

---

elections]." *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 275 (1971). The Court in *Roy* noted that " '[i]f actionable defamation is possible in this field, one might suppose that the chief energies of the courts, for some time after every political campaign, would be absorbed by libel and slander suits.' " *Id.* (quoting Noel, *Defamation of Public Officers and Candidates,* 49 Col. L. Rev. 875 (1949)).

Although the majority cites several cases involving claims of defamation made by candidates for public office, majority op. ¶ 41 n.14, the majority fails to cite a single case where a candidate succeeded in prosecuting a defamation claim.

[7] A "Law Note" with this identical categorization has been part of the Wisconsin Civil Jury Instructions since 1984.

¶ 152. To discourage the use of defamation claims as a tool to suppress political speech, candidates for public office must meet a high standard to prove defamation. It is not that we love public officials less, but that we love freedom of expression more, that we must hold *any* public official to a high standard in a defamation suit.

¶ 153. I doubt that if this court were to engage in a sentence-by-sentence analysis of the Rongstad mailing (or take it as a whole), it would conclude that the mailing was defamatory under the United States Constitution. It is obvious that the majority shares this view, for it assiduously avoids any definitive pronouncement on defamation and attempts to recast the issues so that any such pronouncement is unnecessary.

¶ 154. In my view, the Rongstad mailing was offensive and unfair but not defamatory in a constitutional sense. Lassa had every right to be angry and to take steps to address the criticism she received. On the other hand, she was a public official with access to the news media and ample time before the upcoming April elections to rally people to her defense. There is no discernible reason why the court should have forced Rongstad to answer *every* question related to the 2002 mailing before determining that Lassa's suit could survive a motion to dismiss.

2. The State Interest in Ensuring Accurate Information During Election Campaigns

¶ 155. The majority's claim that the state had a compelling interest to ensure accurate information during an election campaign proves equally unpersuasive in this case.

¶ 156. The nature of the *Rongstad* mailing undermines any claim that the state had an overriding interest in protecting the public from fraudulent and libelous speech. The fact is, even without a court ruling, the mailing backfired. The mailing was so transparently cartoonish and political in nature that it did not hurt Lassa; it helped her.[8] As Bill Berry, a former editor of the Stevens Point Journal, put it, "An outsider doesn't trash a local farm girl up here and get away with it." *See* Bill Berry, *Point counterpoint* (Aug. 28, 2003), http://www.FightingBob.com. Lassa's own complaint acknowledges that her voting percentage went up in the election immediately following distribution of the mailing, when its impact was fresh. Accordingly, it is difficult to accept the proposition that Rongstad's mailing misled anyone.

¶ 157. What's more, *if* the mailing did mislead anyone, Lassa had months to respond and set the record straight. *Cf. McIntyre,* 514 U.S. at 352 n.16. In *McIntyre* the Supreme Court distinguished between the need to prevent fraudulent and libelous speech that occurs in the "eleventh-hour" before an election and

---

[8] As the United States Supreme Court noted in *McIntyre:*

> Don't underestimate the common man. People are intelligent enough to evaluate the source of an anonymous writing. They can see it is anonymous. They know it is anonymous. They can evaluate its anonymity along with its message, as long as they are permitted, as they must be, to read that message. And then, once they have done so, it is for them to decide what is responsible, what is valuable, and what is truth.

*McIntyre v. Ohio Elections Comm'n,* 514 U.S. at 348 n.11 (internal quotation marks and citation omitted). In their rulings, the circuit court and the majority underestimate voters. In doing so, they do a disservice to us all by cheapening the concomitant rights to freedom of speech and freedom of association, and the right to privacy in those freedoms.

258

speech that occurs months in advance. *Id.* Whereas the former affords a candidate no time to respond, the latter gives a candidate adequate time to counter any falsehood. Immediate court action may be necessary to remedy an eleventh-hour attack, but it is less likely to be necessary when the election is several months away.

B. Disclosure Substantially Chills First Amendment Rights

¶ 158. The majority relies upon the test expounded upon in *NAACP,* decided in 1958, and *Buckley* to determine whether Rongstad made a factual showing that disclosure would chill First Amendment rights. Factually, however, the present case is very different from *NAACP, Buckley,* and any of the other cases the majority cites. Unlike the cases cited by the majority, this case concerns a public official's attempt to obtain confidential membership information in the course of a defamation claim *for the purpose of adding those anonymous members as defendants in the lawsuit.* This distinction matters because the amount of time and money required for private individuals to defend against a defamation claim should be recognized as sufficient to establish an objective, substantial chill upon First Amendment rights. *See Torgerson,* 210 Wis. 2d at 538–39 n.14 ("The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself") (quoting *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir. 1967)).

¶ 159. Since the Supreme Court decided *NAACP* and *Buckley,* legislatures, courts, and commentators have come to appreciate just how much lawsuits like this one chill First Amendment rights. Lassa's defama-

tion suit against Rongstad fits within the classic prototype of a SLAPP suit (a Strategic Lawsuit Against Public Participation). Kathleen L. Daerr-Bannon, *Cause of Action: Bringing and Defending Anti-SLAPP Motions to Strike or Dismiss,* 22 Causes of Action 2d 317, 323 (2003) (noting that libel and slander are among the most common claims alleged in SLAPP complaints). SLAPP suits "are fashioned as traditional lawsuits for tortious misconduct but are in actuality thinly disguised efforts to abuse the litigation process in order to silence citizen discussions on issues affecting the public well-being." *Id.* at 322. "The purpose of the SLAPP . . . is distinctly not to succeed on the merits, but to so intimidate the private citizen (or even the government official) that citizen activity ceases because the expense, risk and anxiety engendered by the process of litigating a SLAPP is too great." *Id.; accord In re Discipline of Attorney,* 815 N.E.2d 1072, 1074 n.2 (Mass. 2004); *Dickens v. Provident Life & Accident Ins. Co.,* 117 Cal. App. 4th 705, 713, 11 Cal. Rptr. 3d 877, 882 (Ct. App. 2004).

¶ 160. Since the State of Washington enacted the first statute imposing procedural hurdles upon SLAPP suits in 1989,[9] at least 19 states have enacted legislation to discourage SLAPP suits (anti-SLAPP statutes). *See* Daerr-Bannon, *supra,* at 341–43 (listing 19 states); California Anti-SLAPP Project, http://www.casp.net/menstate.html (last updated Feb. 6, 2006) (listing 24 states). In addition, as of February 2006 anti-SLAPP legislation was pending in 10 states. California Anti-SLAPP Project, http://www.casp.net/menstate.html (last updated Feb. 6, 2006).

[9] *See* Wash. Rev. Code Ann. § 4.24.510 (West 2005) (Historical and Statutory Notes).

¶ 161. Until this case, the term SLAPP suit had been relatively unheard of in Wisconsin jurisprudence.[10] Mention of a SLAPP suit is made in only one Wisconsin case. *See Vultaggio v. Yasko*, 215 Wis. 2d 326, 359, 572 N.W.2d 450 (1998) (Bradley, J., dissenting). In *Vultaggio* Justice Bradley recognized that "[r]egardless of whether such suits are legitimate grievances or SLAPP suits (Strategic Lawsuit Against Public Participation) the possibility of a multi-million dollar lawsuit may chill democratic participation . . . ." *Vultaggio*, 215 Wis. 2d at 359 (Bradley, J., dissenting). I believe that the present suit substantially chills First Amendment rights of speech and association and that the majority seriously errs by refusing to balance the competing interests to determine whether the circuit court should have compelled Rongstad to disclose the membership of

---

[10] While the term SLAPP suit is relatively new in Wisconsin jurisprudence, the core concept is not new. The third-party brief filed by Attorneys Friebert and O'Neill on behalf of Alex Paul opened with the observation:

> This case is a classic example of much ado about nothing. Plaintiff has attempted to manufacture a defamation claim out of a run-of-the-mill negative political ad accurately pointing out that one of her supporters has been charged with criminal conduct.
>
> Her complaint hinges on an allegation, unsupportable by the actual text of the mailer, that the mailer accuses *her* of criminal conduct. Based on this tenuous allegation, plaintiff aggressively pursued contentious discovery from defendant Todd Rongstad, for the express purpose of furthering her political goal of running for the State Senate.

Because the concept of a SLAPP suit—though not the term— was before the circuit court, identifying this case as a SLAPP suit does not alter the "constitutional calculus[.]" *See* Majority op., ¶ 73. Rather, the necessary legal principles were presented to the court by the parties, but the court erred in how it balanced the competing interests.

the Alliance. *Cf. Major v. Silna,* 134 Cal. App. 4th 1485, 1490–91, 36 Cal. Rptr. 3d 875, 878 (Ct. App. 2005) (noting "the anti-SLAPP law has been applied to actions arising from political literature discussing the qualifications of candidates during elections.").

¶ 162. Use of discovery to obtain confidential information pertaining to the membership of the Alliance, and the majority's response, demonstrate the need for legislation to prevent parties from manipulating the legal system to chill the exercise of First Amendment rights. The legislature should consider the experience of other states that have enacted anti-SLAPP statutes and consider adopting legislation modeled upon the anti-SLAPP statutes in states like California, Cal. Civ. Proc. Code § 425.16 (West 2005), and Massachusetts, Mass. Gen. Laws Ann. ch. 231, § 59H (West 2005). The potential for the strategic abuse of legal process is real. As one court put it:

> SLAPP suits function by forcing the target into the judicial arena where the SLAPP filer foists upon the target the expenses of a defense. . . . The purpose of such gamesmanship ranges from simple retribution for past activism to discouraging future activism. Needless to say, an ultimate disposition in favor of the target often amounts merely to a pyrrhic victory. Those who lack the financial resources and emotional stamina to play out the "game" face the difficult choice of defaulting despite meritorious defenses or being brought to their knees to settle. The ripple effect of such suits in our society is enormous. Persons who have been outspoken on issues of public importance targeted in such suits or who have witnessed such suits will often choose in the future to stay silent. Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined.

*Gordon v. Marrone,* 590 N.Y.S.2d 649, 656 (N.Y. Sup. Ct. 1992).

## C. The Order Compelling Disclosure Was Not Narrowly Tailored

¶ 163. The circuit court's order to compel disclosure was not narrowly tailored. The court failed to examine with exacting scrutiny the legitimacy of the asserted state interests and dismissed as unsubstantiated Rongstad's assertion that disclosure would chill First Amendment rights. Based upon these errors, the circuit court ordered Rongstad to comply with its discovery order or pay $1000 per day in contempt. Without a *prior* determination that Rongstad's mailing was capable of a defamatory meaning and that the identity of Alliance members was necessary for Lassa's suit to proceed, I cannot accept that the circuit court's order was narrowly tailored to protect First Amendment rights.

¶ 164. It is difficult to understand how Lassa's interest in being free from defamation was furthered by compelling disclosure of the anonymous speakers at such an early date. Lassa had all the necessary ingredients to clear her name without requiring the disclosure of the Alliance membership. In *Doe v. Cahill,* 884 A.2d 451 (Del. 2005), cited by the majority, the plaintiff did not know the identity of any of the defendants when discovery was sought; here Lassa knew the identity of the primary defendant. Therefore, because "there is reason to believe that many defamation plaintiffs bring suit merely to unmask the identities of anonymous critics[,]" *Cahill,* 884 A.2d at 457, the circuit court should have protected Rongstad and the anonymous speakers from any potential ulterior motive by considering Rongstad's motion to dismiss before compelling discovery.[11] In deciding otherwise, the circuit court and

---

[11] The fact that Lassa agreed to dismiss her defamation claim with prejudice as part of the settlement agreement

the majority appear to have lost sight of the purpose of defamation litigation and the proper balance of the constitutional rights at stake in this case.

¶ 165. To succeed in a defamation claim against a public official, a plaintiff must prove actual malice, which might well require discovery. In this case, however, there are *preliminary* issues to resolve, such as whether the statements in the mailing were substantially true or simply not defamatory as a matter of law. The sine qua non of public figure defamation is the distribution of false words or statements that damage a person's reputation.

¶ 166. A motion to dismiss raises a threshold challenge to a lawsuit, which a court should adjudicate early on so that meritless suits can be disposed of without the expense and delay of discovery and additional litigation. Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1349, at 56–57 (3d ed. 2004). Generally, the standard a complaint must meet to survive a motion to dismiss is toothless. A complaint for defamation, however, must meet a higher standard. Not only must a court decide as

supports an inference that Lassa was more interested in unmasking her anonymous critics than she was in being free from defamation.

In its brief to the court of appeals as amicus curiae, the American Civil Liberties Union of Wisconsin Foundation referred to Lassa's lawsuit as a SLAPP action, i.e., a "Strategic Lawsuit Against Public Participation." It notes,

Because SLAPP actions are so dangerous to free speech, it is crucial to the continued protection of First Amendment freedoms of speech that courts recognize and dismiss these suits in a timely manner, upon proof of failure to state a claim upon which relief may be granted, before compelling answers to discovery questions that require disclosure of potentially constitutionally protected political associations.

a matter of law that the content complained of can support a defamatory meaning, but "the particular words complained of" must be set forth in the complaint. Wis. Stat. § 802.03(6).

¶ 167. Lassa's complaint made assertions of false statements that are simply not contained in the disputed mailing. The "particular words complained of" were either not identified or consisted of the entire paragraph beginning with the sentence fragment: "Extortion, misconduct in public office, pay to play, lying, cheating and stealing." Yet, this paragraph does not contain an assertion that Lassa herself committed any act in the list.

¶ 168. The majority acknowledges that a "defamation plaintiff should not be able to employ the rules of discovery to obtain the identity of an anonymous political speaker simply by filing a complaint that is facially unsustainable." Majority op., ¶ 42. The majority reasons that "the use of discovery to uncover the speaker's identity may chill the exercise of the right to free speech." *Id.* In support of this position, the blue chip amici in this case joined the defendants in urging us to require courts to "decide whether a defamation complaint states a claim on which relief may be granted *before* imposing sanctions for the refusal to disclose information based on the type of constitutional privilege Rongstad has asserted." *Id.,* ¶ 44 (emphasis added). The majority agrees, determining that:

> [U]nder Wisconsin law, requiring the circuit court to decide a motion to dismiss before compelling disclosure and imposing sanctions best addresses the concerns expressed . . . . When faced with an assertion of constitutional privilege against disclosure of information identifying otherwise-anonymous organization members, the circuit court should decide a pending motion

to dismiss for failure to state a claim before sanctioning the party for refusing to disclose that information.

*Id.,* ¶ 52.

¶ 169.　Unfortunately, the majority fails to apply this rule in the present case even though the defendants requested repeatedly that the circuit court act first on the motion to dismiss. In their January 27 Brief in Support of Motion for Protective Order, the defendants objected to the plaintiff's effort to "unreasonably expedite the discovery process. . . . Plaintiff's counsel has offered no explanation as to why discovery must begin immediately." Defendants asked for a postponement of the deposition until they had the opportunity to answer the complaint and file a *motion to dismiss.* "[F]orcing Defendant Rongstad to undergo a deposition *prior to a resolution of these preliminary matters* subjects him to annoyance, oppression, undue burden and expense." (Emphasis added.) The next day, Attorney Crooks requested an adjournment of any depositions until after the court heard the motion to dismiss.

¶ 170.　Defendants answered the complaint on February 10 and filed a motion to dismiss on February 11. The court could have asked for earlier filings from the defendants in lieu of expedited discovery. Instead, the defense was tied up for hours and hours of depositions and hearings before it had an opportunity to file and brief the motion to dismiss. At almost the same time, the court relieved the plaintiff of the burden of submitting to a deposition that might have been useful to the defense in establishing the truth of certain controversial statements in the mailing. Notably, the court issued a protective order for the defamation plaintiff but denied the same for the defamation defendants.

¶ 171. As the majority concedes, the defense was still attempting to get a decision on its motion to dismiss in late April. Majority op., ¶ 56. Nonetheless, the court made no decision on the motion to dismiss until July 8, long after sanctions had been imposed, and 147 days after the motion to dismiss had been filed.

¶ 172. The majority minimizes the defendants' efforts to obtain a ruling on the motion to dismiss before the court imposed sanctions. We are told that few appellate courts have been asked to determine whether such a procedure should be followed. *Id.,* ¶ 46.

> In short, Rongstad did not raise his argument that the circuit court was required to address his motion to dismiss before it compelled discovery until after the court imposed discovery sanctions. Moreover, the argument that the constitutional dimension of the parties' discovery dispute mandated this course of action was a relatively novel one considering existing law at the time. *Id.,* ¶ 58.

Poppycock.

¶ 173. Contrary to the majority's statements, the argument that courts should consider motions to dismiss or motions for summary judgment before compelling discovery in libel suits is not that novel. The "Defamation Law Note for Trial Judges" has contained the following language since 1984:

> The *initial inquiry* in a defamation action is usually whether the words at issue in the lawsuit are capable of a defamatory meaning. This inquiry is for the trial judge and is *normally presented on a motion to dismiss.* On a motion to dismiss, it is the function of the Court to determine whether a communication is capable of a defamatory meaning.

Wis JI—Civil 2500 at 3 (emphasis added). This precise language was cited to the court in Attorney Crooks's

February 11 brief, at the beginning of the section titled "ANALYSIS." Counsel went on to state: "The Wisconsin Supreme Court has been clear in advocating the use of summary judgment and motions to dismiss in cases involving defamation." The brief cited and quoted *Torgerson,* in which the court said:

> Since *New York Times [Co. v. Sullivan,* 376 U.S. 254 (1964)]* summary judgment has played a key role in protecting First Amendment values. Indeed, it has been said that in public figure defamation cases, "because of the importance of free speech, summary judgment *is* the 'rule,' and not the exception." [citation omitted] The Wisconsin court of appeals has said that "[s]ummary judgment may be particularly appropriate in defamation actions in order to mitigate the potential 'chilling effect' on free speech and the press that might result from lengthy and expensive litigation."

*Torgerson,* 210 Wis. 2d at 538. *See also Mach v. Allison,* 2003 WI App 11, 259 Wis. 2d 686, 656 N.W.2d 766 (a Dane County case); *Maguire v. Journal Sentinel, Inc.,* 232 Wis. 2d 236, 605 N.W.2d 881 (Ct. App. 1999).

¶ 174. Furthermore, in 1977, the court in *Hutchinson v. Proxmire,* 431 F. Supp. 1311, 1329 (W.D. Wis. 1977) (reversed on other grounds), recognized that courts must consider dispositive motions, such as summary judgment, as soon as it becomes clear that a plaintiff cannot succeed with her defamation claim. The court noted that "the court has a special responsibility ... to determine if there is any genuine dispute *because of the danger that speech may be chilled by the mere fact of litigation." Id.* (emphasis added). It follows that courts have a special responsibility to consider motions to dismiss as soon as possible to determine whether the speech is even capable of a defamatory meaning. While proof of actual malice may require

additional discovery, proof that a mailing is capable of a defamatory meaning requires at most minimal discovery, and certainly not the unmasking of anonymous speakers.

¶ 175. In *Herbert v. Lando,* a seminal case on public figure defamation, the United States Supreme Court upheld a defamation plaintiff's demands for civil discovery, but the case involved the search for "actual malice," *assuming* the existence of "damaging falsehoods." Justice Powell, in concurrence, remarked that a district court, in supervising discovery in a libel suit by a public figure, "has a duty to consider First Amendment interests as well as the private interests of the plaintiff." *Id.* at 178. "In some instances, it might be appropriate for [the court] to delay enforcing a discovery demand, in the hope that the resolution of issues through summary judgment or other developments in discovery might reduce the need for the material demanded." *Id.* at 180. Justice Brennan and Justice Marshall made even stronger comments in dissent.

¶ 176. These sentiments are echoed in *Sack on Defamation.* "A plaintiff should be required to satisfy the court that the claims at issue are not frivolous before infringing on constitutionally based interests." Robert D. Sack, *Libel, Slander, and Related Problems* § 12.3.2.2 (2d ed. 1994) (citing a host of cases).

¶ 177. In light of the pervasive authority to the contrary, it is hard to accept the majority's conclusion that Rongstad's argument was so novel that the circuit court did not have to address Rongstad's motion to dismiss before compelling discovery or imposing discovery sanctions. Majority op., ¶ 58.

¶ 178. Even if the mailing were capable of a defamatory meaning, however, the court should still have afforded Rongstad a timely ruling on his motion to

dismiss. While Lassa had an interest under the *McIntyre* exacting-scrutiny analysis in being free from defamation, Rongstad had a legitimate First Amendment interest in protecting anonymous political speech. *See McIntyre,* 514 U.S. at 357. Because "anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and . . . dissent[,]" the court order compelling disclosure before a ruling on defamatory meaning infringed upon First Amendment rights. *Id.* When the court refused to timely decide the motion to dismiss, it effectively deprived Rongstad of the opportunity to defend himself and the First Amendment rights of the Alliance membership. It effectively denied him due process of law.[12]

¶ 179. By losing sight of the proper balance of interests and not applying exacting scrutiny, the majority inappropriately justifies the award of sanctions and

_____

[12] *See Lindsey v. Normet,* 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense") (quoting *Am. Surety Co. v. Baldwin,* 287 U.S. 156, 168 (1932)); *cf. Carey v. Piphus,* 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property"); *Goldberg v. Kelly,* 397 U.S. 254, 267–68 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard. . . . In the present context these principles require . . . timely and adequate notice, and an effective opportunity to defend by confronting any adverse witnesses and by presenting . . . arguments and evidence orally.") (internal citations and punctuation omitted); *William B. Tanner Co. v. Estate of Fessler,* 100 Wis. 2d 437, 446, 302 N.W.2d 414 (1981) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

compulsion of discovery. The majority justifies this decision by asserting that Rongstad's counsel did not properly raise the issues before the court and, therefore, did not assert his constitutional rights. Try as it may, the majority cannot change the context in which Rongstad's counsel presented the issues to the court. The record is clear that counsel for the defense timely advised the circuit court of law and procedure to allow it to respect and conform to First Amendment principles. The court demonstrated such disdain for the defendants, however, that it disregarded these principles.

¶ 180. The right to anonymous speech would mean nothing if courts could require the exposure of an anonymous speaker who did *not* issue a defamatory statement. At a minimum, the circuit court should have determined whether Rongstad's mailing was capable of a defamatory meaning *before* ordering discovery and imposing sanctions.

¶ 181. Finally, even if I were wrong in how I balance the interests involved, I cannot understand how the majority can refuse to give Rongstad the benefit of the rule it adopts. *Contra Jacque v. Steenberg Homes, Inc.,* 209 Wis. 2d 605, 625, 563 N.W.2d 154 (1997). In *Jacque* this court stated that a court should apply a new rule retroactively when refusing to do so would deprive the party who prompted the change of any benefit from its efforts and expense in successfully fighting to change an old rule. *Jacque,* 209 Wis. 2d at 625–26. The majority does Rongstad a grave injustice by denying him the benefits of his efforts.

## III. CONCLUSION

¶ 182. In this case, no court has ever ruled that the 2002 mailing was defamatory. A circuit court judge

(Maryann Sumi, Judge) ruled that the mailing was *capable* of defamatory meaning but only after contempt sanctions had been imposed. This procedure denied defendant Rongstad an authoritative judicial ruling on his motion to dismiss before the court required him to submit to total discovery. If the court had made a prompt ruling that the mailing was capable of defamatory meaning, Rongstad might have yielded to the court's order. In any event, the court's ruling would have gone a long way toward protecting Lassa's name before the senate election. The court's unwillingness to make a timely ruling on the motion to dismiss permitted the opposite inference.

¶ 183. In the absence of such a ruling, it is draconian to subject Rongstad to the heavy, heavy financial sanctions at issue in this case. We cannot remedy the procedural wrong that trivialized the defendants' constitutional right to anonymously exercise their right to speak and associate freely. We can and we should, however, nullify the penalty imposed upon the defendants for attempting to assert First Amendment rights.

¶ 184. From the beginning, the circuit court treated this case as though the plaintiff were helplessly chained to a railroad track with a speeding train just around the bend. The facts never supported such urgency. Senator Lassa is a shrewd and savvy legislator with a good reputation and durable popularity. She waited more than two months after she won 73 percent of the vote before she filed suit because she did not have to rescue her good name. She did not file suit in her home county to protect her reputation among her voters. She filed suit in Dane County, where her reputation was never at risk.

¶ 185. The majority sees nothing amiss in socking the defendant $65,000 for advocating the very First

Amendment principles that this court approves. This case will prove without doubt to be a significant libel case, not necessarily for the law it has promulgated, but for the fact that a public figure defamation plaintiff got everything she wanted without ever proving defamation.

¶ 186. Because I fear the majority decision chills freedom of expression not only for members of the Alliance, but for all Wisconsin citizens, I respectfully dissent.